Amy ADLER

v.

The LINCOLN HOUSING AUTHORITY et al.

No. 87–76–Appeal.

Supreme Court of Rhode Island.

July 6, 1988.

Joseph F. Penza, Jr., Olenn & Penza, Lauren E. Jones, Nicholas E. Tishler, Jones & Aisenberg, Providence, for plaintiff.

Edward J. Mulligan, Pawtucket, M. Durkan Cannon, Woonsocket, for defendants.

## OPINION

MURRAY, Justice.

This is an appeal from a judgment of the Superior Court granting the defendants' motion for a directed verdict. We affirm in part and reverse in part.

The plaintiff, Amy Adler, was an employee of the defendant town of Lincoln Housing Authority and was supervised by the executive director, the defendant John Palma (Palma). The plaintiff's employment was terminated on February 5, 1982. She alleges that her discharge was due to her exercise of free speech under the First Amendment to the United States Constitution, in violation of 42 U.S.C.A. § 1983 (West 1981).[1] The trial justice held that plaintiff failed to meet the burden of making an initial showing that her speech was constitutionally protected. He granted de-

---

1. 42 U.S.C.A. § 1983 (West 1981) provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

fendants' motion for a directed verdict and dismissed the complaint.

The facts are largely undisputed. The plaintiff learned of an employment possibility at the Lincoln Housing Authority in December 1980 from her father, Robert Custis, who at that time was chairman of the board of commissioners of the housing authority. The plaintiff was interviewed by defendant Palma and was later offered a position that was titled "secretary/bookkeeper and leased housing manager." Her responsibilities included administration of the federally funded section–8 housing program. The plaintiff worked with Palma and the assistant executive director, Carol Kennedy (Kennedy).

Working relations in the office were pleasant until June 1981, when plaintiff noticed strained relations between Palma and Kennedy. Kennedy informed the board of commissioners about the developing hostilities between her and Palma. The board convened to discuss the matter, and on the following day, plaintiff, Palma, and Kennedy met with the chairman and vice-chairman at the housing authority office. The plaintiff and Kennedy were directed to report any future intra-office problems to Palma first, who in turn would contact the commissioners upon request.

Subsequent to the meeting, relations between Palma and Kennedy grew steadily worse and Palma began to direct his anger toward plaintiff. Both Palma and Kennedy testified that Kennedy's refusal to intervene and help resolve a personal matter between Palma and his girlfriend was the cause of their deteriorating relationship.

Beginning in October 1981 plaintiff maintained written records regarding Palma's behavior. She noted that Palma's conduct included excessive absenteeism and use of the office as a personal residence. In addition, plaintiff stated that Palma used public vehicles for personal matters, purchased fuel with housing authority credit cards, and charged long-distance telephone calls to the office. The plaintiff believed that Palma was improperly ignoring regulations concerning the priority of applicants for section–8 housing and that because of his actions the tenants were being deprived of benefits intended for recipients of federal assistance.

The plaintiff apprised her father of Palma's activities. A meeting of the entire board of commissioners of the housing authority was convened on January 7, 1982. Subsequently, personnel relations worsened, and on February 2, 1982, defendant Palma, through Kennedy, informed plaintiff that she was no longer responsible for administering section–8 housing. In response plaintiff approached Palma and inquired about his decision to change her duties. Palma replied that he owed her no explanation. The plaintiff asked to file a grievance, and Palma replied that the request was denied. The plaintiff questioned Palma's authority to deny her the right to file a grievance, and he replied that if she questioned his authority, she was fired.

The plaintiff contacted one of the commissioners who instructed her to compose a written grievance for review by the board of commissioners. The plaintiff provided a copy of the grievance to Palma in accordance with the directive that she had received from the chairman and vice-chairman of the board. On Friday, February 5, 1982, plaintiff received a letter from Palma stating that she was terminated for "noncompliance and acceptance of work directives and work orders of the Executive Director * * *. Additionally, your direct appeal to the individual Commissioners for reversal of the Executive Director's orders was in violation of personnel policy, and thereof renders you grossly insubordinate to your superior."

At plaintiff's request, the board of commissioners held a hearing on March 18, 1982, regarding her termination. The board sustained Palma's decision to terminate plaintiff. The plaintiff instituted proceedings in Superior Court, alleging that defendants terminated her for speaking out about defendant Palma's malfeasance in office. The plaintiff also sought damages against defendant Palma, individually, for the intentional infliction of emotional dis-

tress.[2]

At the close of plaintiff's testimony the trial justice granted defendants' motion for a directed verdict. The plaintiff alleges that the trial justice (1) erroneously directed a verdict for defendants, (2) erred in dismissing the § 1983 civil rights claim against defendant Palma, (3) erred in dismissing the § 1983 civil rights claim against the Lincoln Housing Authority, and (4) erred in dismissing the conspiracy claim.

## I

In considering a motion for a directed verdict, the trial court should review the evidence in the light most favorable to the nonmoving party, without weighing the evidence or the credibility of the witnesses, and extract from the record only the reasonable inferences that support the nonmoving party's position. "If, after such review, the court finds no issues upon which reasonable persons might draw conflicting conclusions, the court should grant the motion. On appeal, we use the same criteria in reviewing the motion." *Sousa v. Chaset*, 519 A.2d 1132, 1135 (R.I.1987); *Powers v. Carvalho*, 117 R.I. 519, 524–25, 368 A.2d 1242, 1246 (1977).

In the instant case the trial justice granted defendants' motion for directed verdict. He observed that plaintiff was among ten applicants for the position at the housing authority but stated, "It just so happens that Amy Adler was the daughter of Robert Custis who was the chairman of the Board of Commissioners. * * * So we can say with a certain degree of certitude that at that time nepotism was alive and well in the Lincoln Housing Authority." In addition he stated that "Amy Adler became dissatisfied with the way Mr. Palma was performing his functions. She doesn't like the silent treatment. She doesn't like his inconsistent moods, and so she chose to violate the directive of the Commissioners. She went to her father who happened to be the chairman of the commissioners." In addition to references that plaintiff was

related to the chairman, the trial justice speculated about plaintiff's motivation.

In his decision the trial justice stated, "It is also interesting that before that time Mr. Custis had been in a dispute with Mr. Palma. Mr. Palma had made public allegations about Mr. Custis using maintenance personnel of the Authority at his home and summer residence. Now we begin to see what some of the motivation here may have been. So, Amy Adler became the spy who came in out of the cold." Further, the trial justice inferred from the evidence that "when the plaintiff went to her father with these allegations she had one of two things in mind, either she wanted Mr. Palma fired, or she wanted her father to intervene with Mr. Palma so that Mr. Palma would knuckle under to her demands and run the office as she wanted it run."

The trial justice concluded that plaintiff was grossly insubordinate and disloyal to her superiors and that if she had been employed in the private sector her termination would have been certain. The trial justice remarked that "the fact of the matter is Mr. Palma was the boss and in public employment, at times, public employees must work for petty dictators."

 It is our considered judgment that the trial justice did not review the evidence in the light most favorable to plaintiff. Thus, the trial justice erred in granting the motion for directed verdict. The repeated references to the fact that plaintiff's father was the chairman of the board of commissioners indicates that the trial justice attached negative inferences in making his determination. The fact that plaintiff's father was chairman is irrelevant. The plaintiff asked to file a grievance, and Palma responded by denying the request and threatening to fire her if she questioned his authority. Because the board of commissioners is vested with the ultimate control over the housing authority, clearly plaintiff's only available recourse was to alert those authorities about Palma's alleged felonious activities. Undoubtedly, plaintiff

---

**2.** The trial justice granted defendant's motion for a directed verdict for the claim for damages for the intentional infliction of emotional distress. The plaintiff does not appeal from the dismissal of said count.

would have contacted the board whether her father was a member or not.

According to the record, plaintiff testified that she informed the commissioners about Palma's malfeasance because, in her opinion, his actions worked to the detriment of the tenants of the housing authority. The plaintiff's responsibilities for bookkeeping provided access to documents that indicated that Palma was converting federal funds for personal use. However, the trial justice stated that:

> "He was perfectly straightforward and honest with the Commissioners. He told them he had been staying at the authority offices for a period of time and vowed that this would not continue. He admitted to use of the gas credit card and agreed to make restitution for what little gas he had charged on personal business. He admitted that he had used the truck to carry some furniture back up this way from Wickford."

The plaintiff testified that she reported Palma's activities because she believed that the housing authority and its tenants had been deprived of benefits and that his malfeasance constituted a matter of public concern. Palma admitted to the accuracy of many of the allegations. We conclude that the trial justice drew improper inferences and failed to extract the reasonable inferences that clearly supported plaintiff's position. In view of the testimony presented, at minimum, reasonable persons might form conflicting conclusions.

## II

We turn to plaintiff's contention that the trial justice erred in finding her speech not to be constitutionally protected.

It is clearly established that the government "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, —— U.S. ——, ——, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324 (1987).

> "The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983)." —— U.S. at ——, 107 S.Ct. at 2896, 97 L.Ed.2d at 324.

The Supreme Court has set forth a three-step analysis in examining a public employee's claim of unconstitutional retaliation. First he or she must demonstrate that the speech was protected by the First Amendment. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Next, the plaintiff must show that the complained of conduct was a substantial or motivating factor in the defendant's decision to dismiss him or her. Thereafter, the employer has the burden of proving by a preponderance of the evidence that it would have reached the decision to terminate even in the absence of the plaintiff's exercise of allegedly protected speech. *Id.*

The trial justice concluded that, as a matter of law, plaintiff failed to meet the initial burden required in the three-step process. The question whether an employee's speech, for which he or she was allegedly fired, addresses a matter of public concern must be determined by an examination of the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720 (1983). If the discharged employee's speech cannot be characterized as a matter of public concern, the reasons for the employee's discharge need not be scrutinized. *Id.* at 146, 103 S.Ct. at 1690, 75 L.Ed.2d at 719. If, on the other hand, the employee's speech meets the threshold requirement, a court must then balance the employee's interest in free expression against the government's interest in curtailing the expression for "the effective and efficient fulfillment of its responsibilities to the pub-

lic." *Id.* at 150, 103 S.Ct. at 1692, 75 L.Ed. 2d at 722.

■ With regard to the inquiry whether the speech was protected by the First Amendment, we note that it is the role of the trial justice to determine the entire question as a matter of law. In *Connick* the Court said in a footnote that "[t]he inquiry into the protected status of speech is one of law, not fact." 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, 75 L.Ed.2d at 720 n.7; *see also Rankin,* —— U.S. at ——, 107 S.Ct. at 2897 n. 9, 97 L.Ed.2d at 325 n.9. Thereafter, the jury's role is to decide the remaining two elements of a claim: whether the plaintiff had proven that his or her speech was a substantial or motivating factor in the defendant's actions and whether the defendant had proven that it would have terminated the employee absent the exercise of allegedly protected speech. *Greenberg v. Kmetko,* 840 F.2d 467 (7th Cir.1988).

■ In the case before us the trial justice found that plaintiff's speech was not a matter of public concern. We have examined the testimony and evidence set forth by plaintiff concerning defendant Palma's malfeasance. We focus particularly on Palma's admissions to plaintiff's allegations concerning the misuse of public funds and equipment. We are of the opinion that plaintiff's comments address a matter of public concern. Palma was empowered to allocate federal funds to eligible and qualified recipients. He breached his duty of trust to the taxpaying citizens who rely upon the integrity of civil servants selected to administer our system of government. We do not view the fact that Palma was candid about being dishonest and derelict in performing his duties as executive director as negating the validity of plaintiff's exercise of protected speech. Thus, we hold that plaintiff's speech was a matter of public concern and is entitled to First Amendment protection.

The trial justice, in reaching his conclusion, discussed various factors that he believed to weigh against plaintiff's position. He concluded that the speech would impede harmony among coworkers. It is apparent from the testimony of the employees that harmony among coworkers had dissipated prior to plaintiff's comments. In addition the trial justice decided that plaintiff's allegations were not true. However, Palma plainly admits to some of plaintiff's contentions with regard to his misconduct.

■ The trial justice erred in weighing the fact that plaintiff had private and surreptitious meetings with the commissioners rather than public meetings. The United States Supreme Court views with approval the fact that a "public employee * * * arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619, 625 (1979). Such employee does not lose the right to free speech provided in the First Amendment by virtue of electing to exercise such speech privately rather than publicly. We note with approval the holding in *Czurlanis v. Albanese,* 721 F.2d 98 (3rd Cir. 1983), where the Third Circuit observed that " '[w]e do not underestimate the internal unease or unpleasantness that may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which [he or she] believes merits review and reform. That is the price the First Amendment exacts in return for an informed citizenry.' " *Id.* at 105. Indeed, here plaintiff demonstrated restraint by informing Palma's superiors about his conduct rather than make a public announcement.

Accordingly the trial justice erred in dismissing the § 1983 civil rights claim against defendant Palma.

### III

■ The plaintiff contends that the trial justice erred in dismissing the § 1983 claim against the Lincoln Housing Authority. We agree. The trial justice stated that "the Commissioners, in upholding the dismissal of the plaintiff, were not establishing a policy for the future to effect that employees of this Authority will be termi-

nated and fired if they exercise their right of free speech." The plaintiff argues that the trial justice erred because he only considered the fact that the board's ratification of plaintiff's termination was not indicative of future policy. We recognize that a single decision by a municipality can create liability for a § 1983 civil rights claim. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In *Pembaur* the Court held that a single decision by a municipality constitutes an act of official policy possibly rendering it liable under an otherwise valid § 1983 claim. The Court stated that: "municipal liability under § 1983 attaches where —and only where —a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483–84, 106 S.Ct. at 1300, 89 L.Ed.2d at 465. *See also City of St. Louis v. Praprotnik*, — U.S. —, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In *City of St. Louis* the court stated that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." — U.S. at —, 108 S.Ct. at 926, 99 L.Ed.2d at 120.

In the case before us a review of the table of organization in the personnel-policy manual indicates that the board of commissioners retains control and final authority over the executive director. The board ratified the decision by Palma to terminate plaintiff.

Thus we hold that *Pembaur* is applicable to the instant case and that the trial justice erred in dismissing the § 1983 civil rights claim against the Lincoln Housing Authority. The housing authority, as a properly constituted administrative body, is liable for acts that it has officially sanctioned or ordered. *Pembaur*, 475 U.S. at 480, 106 S.Ct. at 1298–99, 89 L.Ed.2d at 463.

## IV

The plaintiff argues that the trial justice erred in dismissing the conspiracy claim against the board of commissioners. He held that there was "a complete [dearth] of evidence" to prove the conspiracy claim. Our review of the record indicates that there is insufficient evidence to support the claim. Thus, we uphold the dismissal by the trial justice of the conspiracy claim.

Accordingly the decision of the Superior Court is reversed in part and affirmed in part. The case is remanded for further proceedings consistent with this opinion.