**Joseph E. WILKICKI, Jr., Plaintiff,**

v.

**Michael BRADY, et al., Defendants.**

No. Civ. A. No. 93–0510 P.

United States District Court,
D. Rhode Island.

April 25, 1995.

---

John W. Dineen, Providence, RI, for plaintiff.

Marc DeSisto, Providence, RI, for defendants.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Plaintiff Joseph E. Wilkicki, Jr. ("Wilkicki") brought this action pursuant to 42 U.S.C. § 1983, alleging that he was discharged from public employment as a police officer in retaliation for his exercise of protected First Amendment activities. In addition, he brings two pendant state claims against defendants. This case is now before the Court for further consideration of the plaintiff's motion for summary judgment. For the reasons set forth below, this court grants summary judgment for the defendants.

### I.

Plaintiff initially moved for summary judgment on July 16, 1994. On September 22, 1994 this Court issued a Memorandum and Order denying the motion without prejudice. However, in that Memorandum, the Court identified an issue concerning the waiver of plaintiff's First Amendment rights that is critical to the viability of this action. As a result, I required both plaintiff and defendants to file supplemental pre-trial memoranda addressing the factual and legal components of this issue. Although I denied the motion without prejudice, this issue is part and parcel of that motion for summary judgment. Both parties did, in fact, submit further briefs and the instant Memorandum and Order followed accordingly. In light of the foregoing, it is appropriate to consider the original denial without prejudice of plaintiff's motion for summary judgment as a stay of final judgment pending further briefing.

▮▮▮ I also note that this Court has the authority to render summary judgment in favor of the nonmoving party even though he or she has made no formal cross-motion under Rule 56. *See National Expositions v. Crowley Maritime Corp.,* 824 F.2d 131, 133 (1st Cir.1987) (citations omitted). Provided that the "losing party" is put "on notice that she had to come forward with all of her evidence" a court may enter summary judg-ment *sua sponte. National Expositions,* 824 F.2d at 133 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). This "notice" requirement consists of providing "an adequate opportunity to demonstrate why summary judgment should not be granted" to the party against whom judgment is entered. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720, at 27.

▮▮▮ It is clear that the plaintiff in this case had an adequate opportunity to address the issue upon which this entry of summary judgment is premised; in fact, this Court acknowledged the critical nature of the waiver issue in the September Memorandum and Order, noting its "potential to undermine the action." Memorandum and Order, 9/22/94 at 7. As I noted above, both sides were requested to and did submit further briefs.

### II.

▮▮▮ The appropriate standards for granting summary judgment are clear:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*

Fed.R.Civ.P. 56(c) (emphasis added). It is well settled that the party moving for summary judgment has the burden of demonstrating that the above test has been satisfied. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it." 10A C. Wright, A. Miller & M. Kane, *supra* § 2727, at 124–25. *See also, Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Upon motion, summary judgment is "mandate[d] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. . . ." *Celotex Corp.,* 477 U.S. at 322,

106 S.Ct. at 2552 ·(1986). In the instant matter, because I am considering, *sua sponte,* a "motion" for summary judgment by the defendants, defendants bear the burden of proof and I will construe the evidence in the light most favorable to the plaintiff.

### III.

In the original Memorandum and Order of September 22, 1994, I summarized the detailed, and partially contested events that preceded plaintiff's discharge and initiation of suit. In the interest of providing a self-contained ruling, I recount these events below.

Plaintiff was hired by the Town of Charlestown as a Probationary Patrolman in the Charlestown Police Department ("Department") in November of 1977. In December of 1980 he was promoted to Sergeant, and in July of 1983 he was promoted to Lieutenant. From May through September 1987 plaintiff was appointed Acting Police Chief. In September of 1987 defendant Michael Brady ("Brady") was appointed Chief of Police for the Town of Charlestown. Plaintiff resumed his position as second in command and continued his position as Lieutenant.

In September of 1990 Brady filed a departmental complaint against Wilkicki alleging misconduct. Plaintiff was charged with inappropriately accessing information from the computer of another police officer without authorization and taking supervisory rights in contravention of department policy. Plaintiff was suspended, and in October of 1990 Brady ordered an investigation of plaintiff with respect to additional allegations of misconduct unrelated to those set forth in the September complaint. While on suspension, Wilkicki assembled an itemized list of complaints against Brady. In November of 1990, Brady filed a complaint with the Rhode Island State Police alleging that Wilkicki had attempted to extort him through the charges that Wilkicki had made about him and the administration of the department. No charges of criminal complaints resulted from Brady's allegations.

In December of 1990, plaintiff mailed a letter to the Charlestown Town Council detailing the above mentioned charges against Brady and listing a number of complaints concerning the administration of the Department. Wilkicki subsequently sent copies of the letter to individual members of the Town Council. The itemized complaints concerned the personal situation of the plaintiff, the internal workings of the department, as well as a number of issues of public concern, including, but not limited to, improper use of town funds. Plaintiff requested investigation of these charges. In January of 1991, Wilkicki sent another letter to the Town Council, made note of two additional charges, and incorporated the prior complaints.

On March 7, 1991, Brady amended his departmental complaint against Wilkicki by adding charges that he violated Department rules and regulations with regard to filing a complaint against a fellow officer, that Wilkicki had attempted to extort Brady by going public with his charges and that Wilkicki had violated the "chain of command" by taking said charges to the Town Council pursuant to the above noted letters. Brady sought Wilkicki's termination as a police officer.

Prior to a law enforcement Bill of Rights Hearing in March of 1991, Wilkicki and Brady had a preliminary meeting and entered into some form of agreement that resolved the charges against the plaintiff. Both parties were represented by attorneys. Pursuant to this agreement, Wilkicki agreed to withdraw his public complaints against Brady in a letter to the Town Council. The exact wording of the withdrawal letter was to be agreed upon by the parties. Plaintiff was also "reassigned" from Lieutenant to Sergeant and placed on probation for one year. The terms of the Consent Order were read into the record on March 26, 1991 at a Bill of Rights Hearing. All parties agreed that there would be no statements made with respect to the settlement conference or the agreement.

The parties dispute whether or not a draft letter had been agreed upon the night of the preliminary meeting. In addition, it was the belief of the plaintiff that Brady had breached the terms of the Consent Order. Wilkicki subsequently refused to withdraw the charges made against Brady to the Town Council.

Wilkicki returned to work in April of 1991 as a Sergeant and thereafter, in September of 1991 moved to be reinstated to the rank of Lieutenant. On or about the same time, Brady demanded that Wilkicki withdraw his complaints made to the Town Council and filed a departmental complaint against him for his refusal to do so, alleging that Wilkicki was violating a direct order. Plaintiff's reinstatement was approved and the order was subsequently rescinded after Brady was granted a request for a temporary restraining order by the Washington County Superior Court.

On February 20, 1992 Brady suspended Wilkicki for two days for failing to comply with his order of September, 1991, and again ordered plaintiff to withdraw the charges he had made against Brady to the Town Council. Plaintiff refused and was given an additional two day suspension. On March 3, 1992 Brady filed a new departmental complaint against plaintiff alleging insubordination by failing to execute a direct order of a Lieutenant LeFebvre and by failing to comply with Brady's direct order to withdraw the aforementioned charges. On March 4, 1992 Wilkicki sent another letter to the Town Council reiterating the original charges against Brady and asking again for an investigation. On March 6, 1992 Brady amended his departmental complaint, alleging that Wilkicki had again breached the chain of command and moved for his termination as a police officer. As a result, plaintiff was suspended pending the outcome of a Bill of Rights Hearing. A November 1992 decision found in favor of Brady against Wilkicki. Plaintiff received a ninety day suspension, was demoted from Sergeant to Probationary Patrolman, and denied any opportunity for promotion for one year. This decision is on appeal in the Superior Court.

On February 8, 1993 plaintiff returned to work and was again ordered by Brady to withdraw the charges made against him. Wilkicki refused and consequently was relieved of duty. Brady requested that plaintiff be terminated from employment as a police officer. The following day, at a termination hearing before the Town Administrator, Wilkicki was, in fact, terminated.

IV.

I note at the outset that there is a paucity of First Circuit authority on the waiver of constitutional rights in a civil context. Where there is no Supreme Court authority, I rely extensively on analogy and the decisions of other circuits for guidance.

■ It is well settled that an individual can waive his or her constitutional rights in both civil and criminal proceedings. *See, e.g., D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972) *citing Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (right to due process hearing); *Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970) (right to be present at trial); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (rights to counsel and against compulsory self-incrimination); and *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963) (habeas corpus). However, because of the pivotal importance of one's constitutional rights, courts "do not presume acquiescence in the loss of fundamental rights," *Ohio Bell Tel. Co. v. Public Utilities Comm'n*, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937) but, rather, " 'indulge every reasonable presumption against waiver' of fundamental rights." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (citations omitted).

A.

*Voluntary, Knowing, and Intelligent Standard*

■ In the criminal context, the Supreme Court has applied these general principles to find that a waiver of constitutional rights must be voluntary, knowing, and intelligent in order to be enforceable. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). While it has not been expressly held, this "voluntary, knowing, and intelligent" standard has been applied by the Supreme Court to the evaluation of a waiver of constitutional rights in civil cases. *See U.S. v. Local 1804–1 Int'l Longshoremen's Ass'n, AFL–CIO*, 44 F.3d 1091, 1099 (2d Cir.1995) (citing *D.H. Over-*

*myer,* 405 U.S. at 187, 92 S.Ct. at 783; *Davies v. Grossmont Union High School Dist.,* 930 F.2d 1390, 1394–95 (9th Cir.), *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991)).

In determining whether a waiver has been voluntary, knowing, and intelligent, courts have taken into consideration the totality of the circumstances and the facts surrounding the particular case. For example, in *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), in deciding whether the complainant's waiver of his right to sue pursuant to § 1983 in exchange for the dismissal of criminal charges against him was voluntary, the court considered the fact that the complainant was a sophisticated businessman, was not in jail, was represented by an experienced attorney who drafted the agreement, and considered the agreement for three days before signing it. *Rumery,* 480 U.S. at 394, 107 S.Ct. at 1192. *See also Hall v. Ochs,* 817 F.2d 920 (1st Cir.1987) (release-dismissal agreement held involuntary where complainant had option to remain in jail or sign waiver, where police held complainant in jail for sole purpose of gaining absolution for prior violations). In *Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d 1390 (9th Cir.1991), in deciding whether the complainant's waiver of his right to seek office as part of a settlement agreement was knowing, the court considered the fact that the plaintiff was represented by counsel during the settlement negotiations, the settlement agreement that he signed stated that he had been advised of the consequences of its terms and knowingly entered into the agreement, and plaintiff was educated enough to understand the meaning of the terms of the settlement agreement. *Davies,* 930 F.2d at 1395. In sum, "[w]aivers of constitutional rights not only must be voluntary, but must also be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady,* 397 U.S. at 748, 90 S.Ct. at 1469 (citations omitted).

### B.

*Public Interest Balancing Test*

Where a *constitutional* right has been waived in exchange for some benefit in a civil context, it has not been settled in the First Circuit whether there is an additional consideration beyond the "voluntary, knowing, and intelligent" standard. At least one circuit has held that even where this standard is satisfied, the waiver is "unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Davies,* 930 F.2d at 1396 (citing *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987)). The Ninth Circuit relied upon *Rumery,* which held that where the waiver of a statutory right is at issue, a court must apply a public interest balancing test. However, because *Rumery* involved the waiver of a *statutory* right as opposed to a *constitutional* right, another circuit has held that there need be no public interest balancing test where the waiver of a constitutional right is at issue. The Third Circuit has stated that while public policy must be considered as a factor in determining whether to give effect to a waiver of constitutional rights, "we are of the opinion that the 'knowing, voluntary and intelligent' standard established by the Supreme Court for the waiver of constitutional rights, subsumes consideration of the public's interests." *Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1099 (3d Cir. 1988) (holding that since the Consent Decree between the litigants settled a suit which included a First Amendment claim, a later, comparable First Amendment claim was also deemed to be waived).

Where a public interest balancing test has been held to apply to the waiver of constitutional rights, "it is the burden of the defendants to plead and prove that the agreement serves the public interest." *Lynch v. City of Alhambra,* 880 F.2d 1122, 1128 (9th Cir. 1989). *See also Livingstone v. North Belle Vernon Borough,* 12 F.3d 1205, 1211 (3d Cir.1993) (waiver of statutory right). The Ninth Circuit has also noted that although not essential to the validity of a waiver, judicial supervision would support enforceability. *Lynch,* 880 F.2d at 1129 n. 10 (citing *Rumery,* 480 U.S. at 398 n. 10, 107 S.Ct. at 1195 n. 10).

## V.

### A.

#### 1.

██ There simply can be no question that Wilkicki entered into the Consent Agreement to withdraw the charges made to the Town Council voluntarily, knowingly, and intelligently. Plaintiff was represented by able counsel who took an active role in the crafting of the Consent Agreement. *See* Bill of Rights Hr'g Tr. 9/24/92 at 126 (upon reviewing the proposal with his attorney, "some [portions] were rejected and some were accepted"). In fact, when questioned about the Consent Agreement, Wilkicki stated, "I willingly participated in [the Consent Agreement] process." Bill of Rights Hr'g Tr. 9/24/92 at 90. This was not a "coercive" situation where plaintiff had no other choice but to waive his First Amendment rights. Wilkicki retained the option to proceed to a Bill of Rights Hearing on the various charges against him but instead chose to participate in a mediation session which resulted in the Consent Agreement. He was not incarcerated, nor was he subject to criminal or civil prosecution solely as a means to force the waiver of his rights, as was the case in *Hall v. Ochs.* In fact, Wilkicki was facing a Bill of Rights Hearing on other charges *before* he sent the letter to the Town Council.

As an experienced police officer and some-time police department administrator and Acting Chief, plaintiff is presumed to have understood the meaning and consequences of an agreement made in lieu of a policemen's Bill of Right Hearing.[1] In addition, Wilkicki testified that he discussed the Consent Agreement with his attorney "in detail." Bill of Rights Hr'g Tr. 9/24/92 at 101.

#### 2.

Plaintiff advances a number of arguments in support of his position that no waiver occurred in the circumstances of this case.

First, plaintiff argues that the alleged waiver took place as part of a Bill of Rights Hearing, a proceeding not empowered to address constitutional issues. Pl.'s Supp. Pre–Trial Mem. at 10 (citing *Lynch v. King,* 120 R.I. 868, 391 A.2d 117, 121 (1978)). "If the substantive First Amendment issue itself (Wilkicki's entire defense) could not have been addressed, then how can the hearing committee arrive at an "order", by agreement or otherwise, which allegedly operates as a waiver of First Amendment rights?" Id. at 11. As a threshold matter, I note that plaintiff's argument misconstrues the nature of the Bill of Rights Hearing that Wilkicki faced. First, it is difficult to imagine that the First Amendment defense was his "entire" defense, when the charges against Wilkicki included a number of departmental charges wholly unrelated to the letter Wilkicki sent to the Town Council.[2] More importantly, the consent agreement was merely read into the record at the Bill of Rights "hearing." The actual agreement was reached at a mediation session between the parties (with the assistance of counsel) conducted the night before the hearing. In essence, there was no need for a formal hearing because the parties had already settled their dispute. Thus, while the March 26, 1991 session was termed a "hearing," there was, in fact, no testimony, no cross-examination, and no final adjudication; for all intents and purposes, there was no Bill of Rights hearing.

Second, plaintiff argues that he never executed a release of any claim that constitutional rights were infringed, i.e., a § 1983 First Amendment claim. "In fact, his primary claim is that he was terminated in *1993* based solely on his refusal to withdraw his complaints. He could not waive in March of 1991 a cause of action which had not fully ripened until 1993." Pl.'s Supp. Pre–Trial Mem. at 13 (emphasis added). Defendants respond, and I quite agree, that it is of no conse-

---

1. I note this only for the record. Plaintiff has advanced no argument premised on the notion that he did not understand the meaning and consequences of the agreement.

2. Plaintiff further makes the claim that "the committee was convened primarily because Wilkicki was 'charged' with the offense of filing public complaints with the Town Council." Pl.'s Supp. Pre–Trial Mem. at 11. In light of the fact that four out of the five charges Wilkicki faced were unrelated to plaintiff's complaint letter, this contention is without support in the record.

quence that plaintiff did not execute a release of his potential § 1983 action. The issue is whether plaintiff validly waived his First Amendment rights with respect to the sending of the letter; if he did, then he may not bring a § 1983 action on the basis that his First Amendment rights were infringed, because he no longer possesses these rights as a result of the waiver.[3]

Third, plaintiff argues that the purported Consent Agreement was not final because the parties never agreed to the wording of the withdrawal letter Wilkicki was to send to the Town Council. It is arguable that, in fact, the language of the withdrawal letter was agreed to by draft. However, viewing the facts in the light most favorable to plaintiff, I will assume that the form of the letter was not agreed upon at the time of the Consent Agreement. Nevertheless, I find that the Consent Agreement was final. As defendants note, "[t]he form of the letter was merely a condition subsequent to the Consent Order. It was the mechanism of accomplishing the withdrawal of the complaints.... There is nothing in the Consent Order suggesting that the form of the letter is a condition precedent to the enactment of the entire Order." Defs.' Supp. Pre–Trial Mem. at 9 n. 6.

### B.

I need not resolve whether this Court must apply a public interest balancing test to determine the enforceability of the waiver of a constitutional right in a civil context. Because I conclude that the public interest in enforcing the waiver outweighs the public policy harmed by enforcement, I find that the waiver is enforceable under the standards employed by both the Third and the Ninth Circuits.

■■■ In the interest of presenting a complete analysis of the issue, I now apply the public interest balancing test to the alleged waiver in this case.

Defendants posit several public interest factors that favor enforcement of the waiver.

As always, there is the important interest of settling litigation, or, in this case, voluntary resolution of the departmental charges against the plaintiff. Settlement is an efficient resolution of dispute. As defendants note, "the burden of proving these five (5) departmental violations would have entailed monopolizing the time and resources of several officers including the Chief of the Charlestown police department. Given the fact that the Charlestown police department is a very small police force, settling the charges avoided taking these officers from their assigned duties." Defs.' Supp. Pre–Trial Mem. at 13–14.

The interest in encouraging settlement has particular strength in this context, where the plaintiff would be continuing to work with the person who brought the charges against him. Simultaneously, the settlement obviated the need for plaintiff's co-workers to testify at a hearing, possibly against him. Settling conflict in this manner allows for the opportunity for normal workplace relations in the future. Were Brady and fellow officers to testify against Wilkicki, workplace relations would likely have been permanently strained, regardless of the outcome of the hearing.

In addition, by settling the claims, "plaintiff obtained a sense of control over his discipline. For example, at plaintiff's insistence, plaintiff was 'reassigned' rather than demoted from Lieutenant to Sergeant. Thus, rather than receiving a disgruntled officer, bitter over the punishment he received, theoretically the police department obtained a satisfied veteran back on the force...." Defs.' Supp. Pre–Trial Mem. at 14. However, at the same time, the settlement made perfectly clear to the members of the police department that they would be held accountable for violations of police rules and regulations.

Finally, permitting an individual to waive his rights in such a manner advances the fundamental principle of personal autonomy. Wilkicki made an arguably rational decision. To deny him the opportunity to exercise his options in the face of a potentially more severe alternative outcome compromises his

---

**3.** I note that plaintiff's waiver of his First Amendment rights relates back only to the terms encompassed within the agreement. I do not find that plaintiff has waived any First Amendment rights he may possess independent of this agreement.

ability to choose. This is an interest the public shares individually and collectively that should not be lightly discounted.

Plaintiff counters that the settlement interest by itself is insufficient and "any interest the defendants have in withdrawing complaints from the council is also pernicious. Such an interest, in silencing complaints, is the antithesis of whistleblowing and the First Amendment." Pl.'s Supp. Pre–Trial Mem. at 8. However, it must be noted that the charge brought against Wilkicki in this regard involved the circumvention of the chain of command. Circumvention of the chain of command has the potential to "disrupt the workings of an organization that relies on order and discipline to operate." Defs.' Supp. Pre–Trial Mem. at 14. Thus, it is clear that the interest in settlement inherently involved an interest in maintaining discipline within the police force.[4] I also note that plaintiff's above quoted statement creates the impression that the waiver constituted a waiver of Wilkicki's First Amendment rights in perpetuity. In fact, the waiver only involves those First Amendment rights relating to the complaints Wilkicki submitted to the Town Council.

Plaintiff argues that there are additional public policy reasons not to enforce the waiver. First, the Wilkicki "agreement" is fundamentally different from the ordinary waiver of constitutional rights. In the typical case, the agreement or plea bargain deals with two sides of the same equation or subject matter. For example, "[i]n return for .. the dropping of part of the charges, the defendant pleads guilty to the related charge." Pl.'s Reply to Defs.' Supp. Pre–Trial Mem. at 5. The Wilkicki "agreement," plaintiff argues, traded "apples and oranges.... Waiving First Amendment rights had nothing to do with the 'charges' against Wilkicki." Id. at 6. This argument ignores the obvious similarities between the two situations and is off the mark. First, a criminal defendant is often charged with virtually unrelated crimes as a result of a single arrest. For example, a defendant may be initially arrested for pickpocketing, be subject to a search, and subse-

quently additionally charged with possession of a controlled substance. Yet it may be possible for a defendant to plead guilty to one charge in order to avoid prosecution of the other. Wilkicki, too, was charged with a variety of violations, including circumvention of the chain of command by submitting complaints directly to the Town Council. By waiving his First Amendment rights by agreeing to withdraw the complaints, Wilkicki agreed to "undo" his violation of the chain of command and thereby forestall a potentially harsher punishment. Plaintiff contends that "[w]e are to accept that a police officer, with numerous acts of misconduct alleged against him (all supposedly having nothing to do with his outspokenness), will be kept on the force, with no further ramifications concerning all the serious 'charges,' if he simply withdraws his whistleblower complaint from the Town council and agrees to never file it again, or even talk about it." Pl.'s Reply to Defs.' Supp. Pre–Trial Mem. at 8. This, however, is an inaccurate portrayal of the agreement. In addition to "undoing" his circumvention of the chain of command, Wilkicki was "reassigned" from Lieutenant to Sergeant. Thus, the agreement addressed both the alleged misconduct and circumvention of the chain of command. As a result, no public policy interest was undermined.

Finally, plaintiff contends that there is a fundamental distinction between the typical waiver of a constitutional right, and the waiver at issue. The public interest is much more at issue in this case, plaintiff argues, than in the typical case where one waives one's own personal right, such as a right to trial by jury. Here, because "whistleblowing" has an aspect of public duty to it, it goes beyond a personal right and can affect an entire community. Thus, plaintiff concludes that the public interest served by allowing whistleblowing outweighs any benefits the Charlestown Police Department hoped to gain by settlement.

While it is true that the waiver of the right to "whistleblow" may have an effect on the community, I do not find that this is

---

4. Plaintiff's citation of *Adler v. Lincoln Housing Auth.*, 544 A.2d 576 (R.I.1988) is not dispositive. Plaintiff notes that Adler was analyzed as a First Amendment case, although the reason for the firing was disobedience of an order and going outside the chain of command. However, *Adler* did not involve a waiver of First Amendment rights upon which the order was premised.

enough of an interest to outweigh the interests in favor of enforcement. Even the waiver of "personal" rights potentially has an effect on the community.[5] Furthermore, the interest of the public here does not rise to the level of that discussed in *Davies,* plaintiff's supporting case. In *Davies,* the court recognized that a restriction on plaintiff's right to run for public office necessarily resulted in a limitation on the fundamental right of every resident in the District to vote. *Davies,* 930 F.2d at 1398. Thus, as a subsequent Ninth Circuit case explained, the most significant factor was "the public interest in allowing the people to vote for representatives of their own choosing." *Leonard v. Clark,* 12 F.3d 885 (9th Cir.1993) (citing *Davies,* 930 F.2d at 1399). However, here, while whistleblowing admittedly has the potential to serve the public, the public has no corresponding constitutional right to require that a person whistleblow. In *Davies,* the enforcement of plaintiff's waiver compromises a fundamental right of the public; in this case, the enforcement of the waiver does not.[6]

### C.

Finally, plaintiff argues that even if the Consent Agreement of March 1991 had been valid, Wilkicki was punished for breaching it in 1992, and already served out his punishment. Plaintiff claims that to be fired in 1993 for not withdrawing his complaint to the Town Council would be to punish him for the same "offense." He concludes that Brady's 1993 decision to terminate Wilkicki therefore must stand on its own, independent of the agreement. I cannot accept this reasoning. Two separate violations of the same kind are not merged simply because they involve the same offense. In 1993, Brady again ordered Wilkicki to abide by the agreement. Wilkicki again ignored Brady's order and refused to comply with it. This was a new violation, as a result of a renewed direct order, in an attempt to enforce the original agreement. The fact that the order was identical both times does not mean that there was only one violation.

### VI.

Because I have determined that plaintiff validly waived his First Amendment rights, I must conclude that there is no genuine issue as to any material fact in the case. A § 1983 action simply has no foundation without a constitutional right upon which violation may be based. For the foregoing reasons, summary judgment granted in favor of defendants.

SO ORDERED.

5. While the connection to the public is certainly less direct, waiver of "personal" rights does impact the public and therefore affects the public interest. For example, when a criminal defendant waives his right to counsel and defends himself, there is a greater likelihood that person will be wrongly convicted than if represented by legal counsel. In this event, as a result, the actual perpetrator of the crime remains immune from retribution and a part of the population at large. Thus, the interest in effective administration of justice may be compromised as well as the safety of the community, by an individual's waiver of a "personal" constitutional right.

6. *Leonard v. Clark* also demonstrates that the *Davies* court was largely influenced by the fact that there was an absence of a close nexus between the right waived and the dispute resolved by the settlement agreement. I have addressed this issue above and note here that it provides another distinction between *Davies* and the instant situation.