March 18, 2019

**Supreme Court**

No. 2016-17-Appeal.
(PC 07-6702)

William Felkner                    :

        v.                    :

Rhode Island College et al.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2016-17-Appeal.
(PC 07-6702)
(Concurrence and dissent begins on page 40)
(Concurrence and dissent begins on page 51)

William Felkner                              :

v.                                           :

Rhode Island College et al.                  :


Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The principles of academic freedom often find uneasy passage in the halls of academia.[1] In this appeal, the plaintiff, William Felkner, describes himself as a "conservative libertarian." He chose, nevertheless, to matriculate in the Master of Social Work program at Rhode Island College's School of Social Work, which, he claims, has a distinct sociopolitical ideology. A clash of values was inevitable. In 2007, Felkner filed an action against Rhode Island College and various college officials (collectively defendants),[2] alleging they had violated his constitutional rights to freedom of expression and equal protection. In 2013, Felkner amended his complaint to include claims for conspiracy to violate his civil rights and a violation of his procedural due process rights. The matter now before us concerns

---

[1] "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself[.]" *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (internal citations omitted).

[2] In addition to Rhode Island College, the defendants are: John Nazarian, the President of RIC at the time Felkner was enrolled at the School of Social Work; Carol Bennett-Speight, Dean of the SSW at relevant times; James Ryczek, an adjunct professor at the SSW at relevant times; Roberta Pearlmutter, a professor of social work at the SSW at relevant times; and S. Scott Mueller, an assistant professor of social work at the SSW at relevant times.

his appeal from a grant of summary judgment in favor of the defendants on all counts and from the dismissal of his claim for punitive damages. For the reasons set forth in this opinion, we vacate the judgment in part and affirm in part.[3]

# I

## Facts and Procedural History

Our summary of pertinent facts is garnered from Felkner's verified complaint and first amended complaint,[4] as well as from the parties' submissions on defendants' renewed motion for summary judgment. For purposes of our summary judgment review, we present the admissible evidence in the manner most propitious to plaintiff, as the nonmoving party. *Lehigh Cement Co. v. Quinn*, 173 A.3d 1272, 1275 (R.I. 2017).

In 2004, shortly after Felkner began his studies at Rhode Island College (RIC), he learned that the School of Social Work (SSW) would be sponsoring a showing of the movie *Fahrenheit 9/11*.[5] Felkner emailed defendant Professor James Ryczek, his instructor for a foundational course called "Policy and Organizing I," objecting to the showing of the film. Felkner asked if the SSW would consider showing the movie *FahrenHYPE 9/11*, a conservative rebuttal to *Fahrenheit 9/11*. According to Felkner, Professor Ryczek responded that the SSW has a mission dedicated to social and economic justice and suggested that "anyone who consistently holds antithetical views to those that are espoused by the profession might ask themselves whether social work is the profession for them." Felkner also wrote an email to Professor Daniel

---

[3] We wish to thank the Foundation for Individual Rights in Education, the National Association of Scholars, and the Cato Institute for their amici curiae brief.

[4] The plaintiff's first amended complaint was the operative complaint at the time of defendants' renewed motion for summary judgment, but this pleading was not verified by Felkner. Our factual summary relies in part on his allegations in his complaints because the initial complaint was properly verified and the amended complaint presented nearly identical allegations.

[5] *Fahrenheit 9/11* is a documentary film written and directed by filmmaker, author, and political commentator Michael Moore.

Weisman, who had sponsored the presentation of *Fahrenheit 9/11*. In response to Felkner's email, Professor Weisman expressed that the SSW was "not committed to balanced presentations" and that, "[f]or the most part, Republican ideology is oppositional to the [social work] profession's fundamental values." Ultimately, however, Professor Weisman presented *FahrenHYPE 9/11* to the same classes that saw *Fahrenheit 9/11*.

As part of "Policy and Organizing I," students were assigned a group project in which they were to debate a social welfare issue and write a policy paper promoting the group's position. According to Felkner, the students could choose from a list of issues provided by Professor Ryczek, all of which involved, in Felkner's words, "a leftist position on social welfare issues." Professor Ryczek also informed the class that each student would participate in a class debate and then lobby for their selected issue before the Rhode Island General Assembly in the next semester's "Policy and Organizing II" class. Felkner joined a class group advocating for passage of Senate Bill 525 (SB 525), which he described as an amendment to "a temporary cash assistance program for Rhode Islanders having a difficult time making ends meet."

Thereafter, however, Felkner asked Professor Ryczek for permission to argue against SB 525 in the class debate after he concluded that "SB 525 did not actually help people get off welfare with higher-paying jobs * * *." According to Felkner, Professor Ryczek denied this request, explaining that RIC "is a perspective school and we teach that perspective" and "if you are going to lobby on [SB 525], you're going to lobby in our perspective." Nevertheless, Felkner wrote his policy paper from a perspective opposing the passage of SB 525 and contrary to—in Felkner's words—Professor Ryzcek's "professed support of a comprehensive welfare state." At his deposition, Professor Ryczek testified that he typically gives a group grade for the group work. However, after members of Felkner's group told Professor Ryzcek that Felkner "was not

participating in the group as expected[,]" Professor Ryczek agreed to "disaggregate" Felkner's grade from the group grade. Professor Ryczek further stated that he had never disaggregated a student's grade before, nor had he ever given a grade lower than an "A minus" or "B plus" for the group class debate. Felkner received a failing grade on both his written assignment and classroom debate because he had not followed the directives of the assignment. Professor Ryczek then offered Felkner an opportunity to rewrite his paper. Ultimately, Professor Ryczek gave Felkner a C plus as his final course grade. Felkner appealed the failing grades for the paper and debate to the Academic Standing Committee (ASC) for the SSW.

On January 20, 2005, the ASC held a hearing on Felkner's appeal. According to Felkner, he was denied the opportunity to question Professor Ryczek at the hearing because Professor Ryczek left the room immediately following his testimony. Because Felkner believed that Professor Ryczek had given inaccurate testimony at the ASC hearing regarding conversations between them, Felkner announced that he would henceforth record all of his conversations with RIC professors. The next day, the ASC denied Felkner's appeal of his grades.

Felkner further appealed the matter to the chair of the Master of Social Work (MSW) program, Dr. Lenore Olsen, and then to the dean of the SSW, defendant Carol Bennett-Speight. In both appeals, the decision of the ASC was upheld. Felkner also contacted the Foundation for Individual Rights in Education (FIRE) about his alleged mistreatment. In a letter to RIC's then-President, defendant John Nazarian, dated January 28, 2005, FIRE noted that, in "[t]he case of Bill Felkner[,]" RIC should "reconsider and withdraw its unconstitutional policies." On February 15, 2005, Nazarian replied that no RIC student had been punished for failing to espouse a certain political belief.

At the close of the Fall semester, Professor Ryczek wrote to Dr. Olsen, informing her that he would not teach the "Policy and Organizing II" class the next semester because, as an adjunct faculty member, dealing with Felkner required too much of his time. Consequently, Felkner was transferred to a section of the course taught by full-time Professor Roberta Pearlmutter. The plaintiff's relations with Professor Pearlmutter, however, were no more salubrious than they had been with Professor Ryczek.

One assignment in "Policy and Organizing II" required students to complete a group project approved by Professor Pearlmutter. Felkner proposed to Professor Pearlmutter that he be allowed to form a group with students from other colleges to lobby RIC for an Academic Bill of Rights. Professor Pearlmutter rejected Felkner's proposal, noting that it did not have a direct impact on the "poor and oppressed" and did not advance "social justice." Professor Pearlmutter also rejected Felkner's request to lobby in favor of the then-governor's welfare-reform proposal for the project.

Next, Felkner suggested that he be allowed to work on a project lobbying for the defeat of SB 525 in the General Assembly. Professor Pearlmutter told Felkner that she would penalize his grade on the project if he did not work on it with classmates from his "Policy and Organizing II" class. Felkner had difficulty recruiting group members because his fellow students had already formed groups to promote policies that were contrary to his "conscience." Because of the "hostility towards his beliefs[,]" Felkner worked on his project with a group comprising himself and two individuals from outside of RIC.[6] Some of his conversations with Professor Pearlmutter took place through the exchange of emails. One conversation about Felkner's proposed projects was in person; Felkner audio-recorded the conversation without Professor

---

[6] Felkner formed a group with a Brown University student and "a local radio personality[.]"

Pearlmutter's knowledge and later posted a rough transcript of the conversation to a website he had created to expose what he characterized as the "liberal bias" at RIC.

During one of Professor Pearlmutter's classes, the students were permitted to discuss their concerns about Felkner's postings on his website related to the "Policy and Organizing II" class. According to Professor Pearlmutter, she was approached by several students who were concerned that the confidentiality of class discussions was being compromised by Felkner when he posted about those discussions on his website. She maintained that students in the class asked that Felkner discuss any issues he had with the class during classroom discussions rather than on his website. Felkner, however, asserted that his conservative views were "assail[ed]" and that Professor Pearlmutter allowed other students to "assault" his views without allowing him the opportunity to respond. According to Felkner, "[t]he unmistakable message Defendant Pearlmutter communicated through the discussion was that only liberal/progressive ideas can help the poor and advance the cause of social justice."

Professor Pearlmutter eventually filed a complaint with the ASC, asserting that Felkner had committed unethical and unprofessional conduct in violation of the National Association of Social Workers (NASW) Code of Ethics. On April 27, 2005, the ASC held a hearing on Professor Pearlmutter's complaint. Thereafter, the ASC issued a written decision, through its chair Dr. Diane Martell, in which it found that Felkner's deceptive conduct in recording his conversation with Professor Pearlmutter violated one of the three sections of the Code of Ethics alleged by Professor Pearlmutter in her complaint. The ASC recommended to the chair of the MSW program that Felkner "declare immediately, in writing, that [he] will henceforth refrain from any deceptive audio or video copying of conversations with social work colleagues and refrain from any audio or video copying without express permission from them." The ASC

further recommended that Felkner be dismissed from the MSW program if he was unwilling to execute such a declaration. In a letter to Dean Bennett-Speight, dated May 11, 2005, Felkner stated that he would refrain from making audio or video recordings of his conversations with his SSW colleagues unless he first obtained their consent to record.

At the end of Felkner's first year in the MSW program, he met with his adviser and chose the Social Work Organizing and Policy (SWOP) concentration for completion of the degree. As a MSW student, Felkner was required to complete a field placement and an integrative project in order to fulfill the MSW program requirements. For Felkner's field placement and integrative project, he secured an internship in then-Governor Donald L. Carcieri's office, working on welfare-reform legislation. Felkner alleged that Professor Ryczek, as director of field placements, rejected Felkner's placement because it would not advance the concentration's objectives of promoting progressive social change. Felkner claimed that Professor Ryczek advised him that the SWOP-concentration objectives required him to advocate for liberal, progressive policies, and that he suggested Felkner's views might make him better suited to another academic discipline, such as political science. The MSW department chair, Dr. Olsen, supported Professor Ryczek's position by indicating that Felkner might consider pursuing other concentrations if he was not able to work on the academic objectives of the SWOP concentration.

On June 9, 2005, Felkner met with Dean Bennett-Speight about his challenges with Professor Ryczek and Dr. Olsen, claiming they were discriminating against him because of his conservative views. Thereafter, Dean Bennett-Speight assigned Professor S. Scott Mueller, also a defendant in this case, as Felkner's field placement supervisor. Professor Mueller also initially rejected Felkner's proposed field placement and integrative project, but eventually RIC approved

the field placement in the Governor's office. According to Felkner, Professor Mueller refused to approve Felkner's proposed integrative project on welfare reform because it was a "toxic" subject. Consequently, Felkner "reluctantly conceded to work on healthcare reform for his [integrative project]." Felkner further asserted that working on healthcare reform put him at a disadvantage relative to other SSW students because he was unable to use his field placement research for his integrative project.

Felkner proceeded to work on his integrative project in the fall of 2006 and most of 2007. On November 26, 2007, Felkner requested an extension of time to complete his integrative project. In January 2008, Dean Bennett-Speight granted Felkner an extension until May 11, 2009, to complete his degree requirements. The extension was conditioned upon Felkner submitting a portion of the project by April 15, 2008, a condition with which he did not comply. On March 17, 2008, Felkner requested an additional six-week extension; but both Dean Bennett-Speight and Professor Pearlmutter denied his request.

In December 2007, amid his integrative project extension requests, Felkner filed the instant action in Providence County Superior Court alleging that defendants' conduct toward him during his enrollment in the MSW program violated his First and Fourteenth Amendment rights. Specifically, Felkner's initial verified complaint included claims for: deprivation of his right to freedom of expression "on issues of political concern" (count one) in part by placing "unconstitutional conditions on [his] continuance in the [MSW] program" (count four); violation of his right to freedom of expression by retaliating against him for "expressing his political beliefs and for publicly criticizing [RIC's] liberal biases" (count two) and by compelling him to "express ideas * * * contrary to his political beliefs" (count three); and violation of his right to equal protection (count five). The defendants answered and filed a motion for summary

judgment, which a hearing justice denied after finding the case to be "extremely fact intensive and not susceptible to disposition by summary proceedings."

On December 3, 2013, Felkner filed an amended complaint, adding two counts. One new claim alleged that defendants had violated his procedural due process rights by the way in which they conducted the ASC hearings related to the complaints involving Felkner (count six). The other new claim alleged that defendants had engaged in a conspiracy to violate his civil rights, in violation of 42 U.S.C. § 1985(3) (count seven). For all of the alleged constitutional violations contained in the amended complaint, Felkner asserted that he was entitled to damages pursuant to 42 U.S.C. §§ 1983 and 1988 as well as the Rhode Island Civil Rights Act (RICRA), including punitive damages. Felkner also sought an order expunging the ASC hearings from his academic file, an extension of time for him to complete his MSW degree, injunctive relief restraining enforcement of RIC's speech code,[7] and attorney's fees.

The defendants sought to strike plaintiff's claim for punitive damages after receiving a request for interrogatories seeking the individual defendants' personal financial details.[8] After conducting a hearing pursuant to *Palmisano v. Toth*, 624 A.2d 314 (R.I. 1993), the hearing justice struck plaintiff's claim for punitive damages, finding that defendants' conduct toward Felkner had not "rise[n] to the level of recklessness or callous indifference" to his constitutional rights and that, therefore, he had not established a prima facie case for punitive damages.

In March 2015, defendants filed a renewed motion for summary judgment on all of plaintiff's claims, arguing in part that defendants were protected from civil liability, if any, by the doctrine of qualified immunity. In Felkner's objection to the motion, he asserted that the law

---

[7] Felkner later relinquished any claim with respect to RIC's speech code.
[8] Specifically, defendants filed a "Motion for Protective Order, or, in the Alternative, Motion to Strike Plaintiff's Claim for Punitive Damages and Assign Matter for Evidentiary Hearing."

of the case doctrine barred the renewed motion for summary judgment because the first motion for summary judgment had been denied and defendants had previously raised the issue of qualified immunity, although the hearing justice had not yet reached the issue or made any rulings thereon. He also argued that, if the renewed motion were to be considered, there were several issues of disputed facts that would preclude the entry of summary judgment against him.

The hearing justice disagreed with Felkner's objections, concluding in a written decision that the law of the case doctrine did not prevent her from deciding defendants' second motion for summary judgment because the record had significantly expanded during the several years of discovery that had taken place between the filing of the two dispositive motions. The hearing justice also concluded that there were no genuine issues of material fact and that defendants were entitled to judgment as a matter of law. The hearing justice did not substantively address the issue of qualified immunity, concluding this issue was moot based upon her conclusion that none of defendants' actions had violated Felkner's First and Fourteenth Amendment rights. Final judgment entered in favor of defendants in November 2015, and Felkner timely filed a notice of appeal.

## II

### Discussion

Felkner is raising four main issues before this Court. The first is whether the law of the case doctrine should have precluded the hearing justice from considering defendants' renewed motion for summary judgment. The second is whether genuine issues of material fact should have precluded the entry of summary judgment for each of Felkner's federal constitutional claims. The third issue is whether the doctrine of qualified immunity protects the individually

named defendants from potential liability. The fourth issue is whether Felkner demonstrated a prima facie case for punitive damages. We take each issue in turn.

## A

## Law of the Case Doctrine

We first briefly address whether the law of the case doctrine should have precluded the hearing justice's consideration of defendants' renewed motion for summary judgment. Felkner argues that the hearing justice erred in considering the renewed motion because she relied upon the same affidavits as those relied on by the first hearing justice who presided over—and denied—defendants' first motion for summary judgment. Felkner also argues that the expanded record reinforced the factual issues, rather than eliminating them.

"The law of the case doctrine provides that, after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." *Quillen v. Macera*, 160 A.3d 1006, 1012-13 (R.I. 2017) (alteration omitted) (quoting *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 677 (R.I. 2004)). "The purpose of the doctrine is to ensure 'the stability of decisions and avoid unseemly contests between judges that could result in a loss of public confidence in the judiciary.'" *Id.* at 1013 (alteration omitted) (quoting *Commercial Union Insurance Co. v. Pelchat*, 727 A.2d 676, 683 (R.I. 1999)). Nevertheless, the doctrine is "a flexible rule" and "may be disregarded when a subsequent ruling can be based on an expanded record." *Id.* (quoting *Berman v. Sitrin*, 101 A.3d 1251, 1262 (R.I. 2014)). "When presented with an expanded record, it is within the trial justice's sound discretion whether to consider the issue." *Ferguson v. Marshall Contractors, Inc.*, 745 A.2d 147, 152 (R.I. 2000) (quoting *Goodman v. Turner*, 512 A.2d 861, 864 (R.I. 1986)).

- 11 -

Nearly seven years elapsed between the two motions for summary judgment filed by defendants in this case. The hearing justice acknowledged that defendants had submitted the same documents in support of their renewed motion, but that the parties had conducted significant discovery and the record had also been expanded by new exhibits. The hearing justice concluded that the law of the case doctrine did not preclude her consideration of the renewed motion for summary judgment because the record before her had "expanded significantly" and included "exhibits that did not exist when the [c]ourt ruled on [d]efendants' first motion for summary judgment."

Our review of the record reveals that the renewed motion for summary judgment was submitted on a much broader record than the original motion for summary judgment. In the intervening seven years, the parties produced additional discovery—the hearing justice referred to "ten depositions and thousands of pages of documents" in her written decision on the renewed motion for summary judgment—and Felkner amended his complaint to add claims for conspiracy and violation of procedural due process. Because the record before the hearing justice had indeed been expanded since the denial of defendants' initial motion for summary judgment, we are of the opinion that she was acting well within her discretionary authority in entertaining and deciding the renewed motion for summary judgment. *See Quillen*, 160 A.3d at 1012-13; *Berman*, 101 A.3d at 1262.

## B

### Constitutional Claims

The hearing justice concluded that Felkner failed to show genuine issues of material fact on any of his claims brought pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violations of his rights to freedom of expression, equal protection, and due process, as well as on his claim

pursuant to 42 U.S.C. § 1985(3), alleging a civil conspiracy to violate these constitutional rights.[9] On appeal, Felkner challenges her conclusions on each of these claims.[10]

# 1

## Standard of Review

"This Court will review the grant of a motion for summary judgment *de novo*, employing the same standards and rules used by the hearing justice." *Newstone Development, LLC v. East Pacific, LLC*, 140 A.3d 100, 103 (R.I. 2016) (quoting *Daniels v. Fluette*, 64 A.3d 302, 304 (R.I. 2013)). "We will affirm a trial court's decision only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Id.* (alteration omitted) (quoting *Daniels*, 64 A.3d at 304). "Furthermore, 'the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions.'" *Id.* (quoting *Daniels*, 64 A.3d at 304). "[S]ummary judgment should enter against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (deletion omitted) (quoting *Lavoie v. North East Knitting, Inc.*, 918 A.2d 225, 228 (R.I. 2007)). "It is a fundamental principle that summary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously." *Botelho v. City of Pawtucket School Department*, 130 A.3d 172, 176 (R.I. 2016) (alteration omitted) (quoting *Tarro v. Checrallah*, 60 A.3d 598, 601 (R.I. 2013)).

---

[9] Felkner has not drawn this Court's attention to any distinction between the application of Rhode Island and federal law regarding his free speech and expression, equal protection, and due process claims. Therefore, we address only the application of federal law to these claims.

[10] Before this Court, Felkner does not discuss either his claims under the Rhode Island Civil Rights Act or his claims for equitable relief. Consequently, we deem them waived.

**2**

**Freedom of Speech and Expression**

Felkner's first claim alleges that defendants deprived him of his rights to freedom of speech and expression secured by the First Amendment to the United States Constitution and article 1, section 21 of the Rhode Island Constitution.[11]   He seeks redress under 42 U.S.C. §§ 1983[12] and 1988,[13] as well as RICRA.

The freedom of speech and expression is perhaps our most cherished right as residents of the United States.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or

---

[11] Article 1, section 21 of the Rhode Island Constitution provides: "The citizens have a right in a peaceable manner to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or for other purposes, by petition, address, or remonstrance.  No law abridging the freedom of speech shall be enacted."

[12] 42 U.S.C. § 1983 provides, in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

[13] 42 U.S.C. § 1988(b) provides, in relevant part, that:

> "In any action or proceeding to enforce a provision of section[] * * * 1983 * * * of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."

other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 641 (1994). Moreover, "one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say * * *.'" *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) (quoting *Pacific Gas and Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 16 (1986) (plurality opinion)).

Nor can it be gainsaid that freedom of speech and expression is alive and well in our public educational institutions. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. * * * The classroom is peculiarly the marketplace of ideas." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 512 (1969) (internal citation omitted) (quoting *Keyishian v. Board of Regents of University of State of New York*, 385 U.S. 589, 603 (1967)). Rights guaranteed by the First Amendment, however, are not unlimited in the context of academia. *See Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

In the case under review, both parties seemingly acknowledge that the *Hazelwood* case is instructive. *Hazelwood* stands for the proposition that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in

school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.[14]

Our task in this appeal is not to determine the breadth of Felkner's constitutionally protected rights of speech and expression while a student in the MSW program at RIC, nor indeed to determine whether such rights are necessarily tempered by "legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. Rather, it is to conduct a *de novo* review of the record and determine whether genuine issues of material fact exist that would preclude the granting of summary judgment. *See Newstone Development, LLC*, 140 A.3d at 103. In that regard, we need go no further than the affidavit of Richard Gelles, Ph.D., submitted in support of Felkner's opposition to defendants' motion for summary judgment.

At the time of his affidavit, Dr. Gelles was the Dean of the School of Social Policy & Practice at the University of Pennsylvania and a former member of the faculty at the University of Rhode Island. After reviewing the allegations in Felkner's verified complaint, Dr. Gelles attested that, if Felkner's claims were true, the alleged conduct by defendants was "contrary to the concepts of academic freedom and constitute a substantial departure from the norms of academic debate and scholarship that should prevail at colleges and universities, as well as in programs and/or schools offering the Masters of Social Work degree[.]"

Specifically, in his affidavit, Dr. Gelles referenced Felkner's allegations that: (1) Professor Ryczek sent an email to Felkner stating that the social work profession has "a mission

---

[14] *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), concerned the First Amendment rights of former high school students who had been staff members of the high school newspaper when the high school principal instructed the supervising teacher to delete two articles from the proof of an edition just prior to publication. *Hazelwood*, 484 U.S. at 262-64. The Supreme Court specifically left open the question of whether "the same degree of deference" given to educators' decisions "is appropriate with respect to school-sponsored expressive activities at the college and university level." *Id.* at 273, n.7. We recognize that *Hazelwood* is distinguishable from the case at hand in several significant respects.

devoted to the value of social and economic justice" and anyone who holds antithetical views "might ask themselves whether social work is the profession for them" and indeed whether RIC is "a good fit for them"; (2) Professor Weisman sent an email which stated that social work is a "values-based profession" and that the SSW has a "responsib[ility] to promote the values that underlie social work. For the most part, Republican ideology is oppositional to the profession's fundamental values"; (3) Felkner's statement that Professor Pearlmutter "led a fifty-minute in-class discussion assailing Mr. Felkner's conservative views" and allowed other students to "assault [his] views without allowing him to respond"; and (4) the fact that Felkner was prevented "from working on a welfare reform project with the Governor's office because" it was contrary to "the political perspective of the project."

In conducting our *de novo* review, we are mindful that neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate[,]" but that such rights must be "applied in light of the special characteristics of the school environment[.]" *Tinker*, 393 U.S. at 506. Accordingly, educational institutions are granted wide latitude to establish their curricula and "further [their] legitimate curricular objectives." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (discussing *Hazelwood*). So, too, must teachers be given "broad discretion to give grades" and "in limiting speech when they are engaged in administering the curriculum." *Settle v. Dickson County School Board*, 53 F.3d 152, 156 (6th Cir. 1995) (citing *Tinker*, 393 U.S. at 512-14). Moreover, "[s]o long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her race, gender, economic class, religion or political persuasion, the federal courts should not interfere." *Id.* at 155; *see Ward*, 667 F.3d at 734 ("[T]he First Amendment does not permit educators to invoke curriculum 'as a pretext for punishing a student * * *.'") (alteration

omitted) (quoting *Settle*, 53 F.3d at 155). Courts "should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) (footnote omitted).

In light of these principles, we are of the opinion that Felkner's freedom of speech claims deserve to go to a jury. The record in this case is voluminous and replete with disputed facts. Resolving all such facts in the light most favorable to Felkner, the issue is whether he has made tenable claims that defendants have violated his constitutional rights to free speech and expression. We believe that he has. Felkner describes himself as a "conservative libertarian" and was no doubt a challenging student with a political agenda as robust as the agenda he ascribes to defendants. Given the broad discretion afforded to educational institutions, he may have a difficult road ahead of him. Nevertheless, he has raised genuine issues of material fact concerning whether the actions of defendants are "reasonably related to legitimate pedagogical concerns" or merely a pretext for punishing him for his conservative views. *See Hazelwood*, 484 U.S. at 273. "Although we do not second-guess the pedagogical wisdom or efficacy of an educator's goal, we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004) (emphases and footnote omitted). The fact that a student may be required to debate a topic from a perspective that is contrary to his or her own views may well be reasonably related to legitimate pedagogical concerns. That relationship is far more tenuous, however, when the student is told that he or she must then lobby for that position in a public

forum or that his or her viewpoint is not welcome in the classroom because it is contrary to the majority viewpoint of the students and faculty.

There is ample evidence in the record which, if found credible by a factfinder, suggests that the MSW program had a strong predisposition toward so-called "progressive" social values. Viewing, as we must, the evidence most generously to Felkner, we are of the opinion that, in light of his avowedly conservative bent, genuine issues of material fact exist as to whether defendants' justifications for their actions were truly pedagogical or whether they were pretextual. *See Axson-Flynn*, 356 F.3d at 1292-93. The subjective motivation of defendants is subject to conflicting interpretations; the duty of a trial justice, and this Court, in considering a motion for summary judgment "is not to resolve disputed factual issues but only to find them." *Pound Hill Corporation, Inc. v. Perl*, 668 A.2d 1260, 1264 (R.I. 1996). We find several here. Accordingly, we vacate the judgment as to count one and remand to the Superior Court for trial or other disposition.

**3**

**Retaliation**

Felkner's second claim alleges that defendants "engaged in actions that are retaliatory and have therefore deprived [him] of his clearly established free speech rights * * *." Felkner specifically alleges that the following conduct was retaliatory: "penalizing his grades, filing ethics charges against him, delaying his graduation, and denying him the opportunity to work on welfare reform in the Governor's office, among other things[.]" In his objection to defendants' renewed motion for summary judgment, Felkner expands on his enumerated list to include "[r]equiring him to stop taping classes and conversations with instructors; * * * [c]omplaining about a website he had created about the political bias he was experiencing; * * * [o]rganizing or

- 19 -

supporting verbal attacks on him against his views; * * * [t]hreatening to dismiss him from the program; * * * [a]ttempting to require him to lobby the General Assembly in support of political positions he opposed;" and "[n]ot permitting him to complete his degree requirements."

To establish a First Amendment retaliation claim, a plaintiff must prove that (1) he "engaged in constitutionally protected conduct" and (2) "this conduct was a substantial or motivating factor for the adverse" action taken against him. *McCue v. Bradstreet*, 807 F.3d 334, 338 (1st Cir. 2015) (quoting *Padilla-García v. Rodríguez*, 212 F.3d 69, 74 (1st Cir. 2000)).

We begin by examining one of the alleged acts of retaliation. Felkner alleges that defendants impermissibly retaliated against him for exercising his constitutional right to record his classes and discussions with faculty. According to Felkner, he began recording conversations with faculty because "he believed that Ryczek had lied to the ASC about their conversations." Felkner also tape-recorded his classes. He would then post a rough transcript of some of these conversations on his personal website. Felkner further asserts that Professor Pearlmutter led a fifty-minute in-class discussion assailing his conservative views and the postings on his website. According to Felkner, Professor Ryzcek also allowed other students to criticize Felkner's views without allowing him to respond. In addition, Professor Pearlmutter filed a complaint with the ASC claiming that Felkner's recordings violated the NASW Code of Ethics. Felkner argues that these actions by defendants were in retaliation against him because he had exercised his constitutional right to free speech.

It is well settled that citizens may record government officials in the exercise of their official duties. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). "The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *American Civil*

*Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). The right to make an audiovisual recording is not absolute, however; "[i]t may be subject to reasonable time, place, and manner restrictions." *Glik*, 655 F.3d at 84. Thus, acknowledging that the right to record is an activity protected by the First Amendment, we proceed to examine the activity in the context of an educational institution.

In this regard, we find *Tinker* to be instructive. *Tinker* involved the right of high school students to wear black armbands in protest of the war in Vietnam. *Tinker*, 393 U.S. at 504. Recognizing the First Amendment rights of the students, the Supreme Court held that speech could be restricted in an educational setting under two circumstances: if the speech "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," or if the speech "colli[des] with the rights of other students to be secure and to be let alone." *Id.* at 508, 514.

As the hearing justice noted in her decision in the present case, "several students expressed their discomfort with Felkner's publication and editorializing of class discussions and activities, which they had previously believed were held in confidence." Clearly, the privacy rights "of other students to be secure and to be let alone" were implicated by Felkner's recordings. *Tinker*, 393 U.S. at 508. Felkner alleges that Professor Pearlmutter retaliated against his exercise of his First Amendment rights by filing a complaint against him with the ASC. The ASC found that Felkner had "failed to adhere to academic standards of the School when [he] deceptively audio-taped a conversation with Dr. Pearlmutter in violation of Section 4.04 of the NASW Code of Ethics." The recommendation of the ASC was that the SSW department chair, Dr. Olsen, request Felkner "to declare immediately, in writing, that [he] will henceforth refrain

from any deceptive audio or video copying of conversations with social work colleagues and refrain from any audio or video copying without express permission from them."

Under the *Tinker* standard, it is apparent that Felkner's recordings "might reasonably have led school authorities to forecast substantial disruption" and "collid[e] with the rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 508, 514. Moreover, as the hearing justice noted, "Felkner was not disciplined for the actual act of recording; rather, he was prohibited from engaging in deceptive behavior by making surreptitious recordings of his colleagues." He was required to obtain permission before recording any conversations, a condition that is seemingly reasonable in the context of higher learning and academic freedom. We conclude, therefore, that Felkner has failed to provide evidence of a disputed issue of material fact demonstrating that any defendant interfered with or retaliated against him for exercising his First Amendment rights with respect to his recording activities.

With respect to Felkner's other claims of retaliatory conduct, as discussed above, genuine issues of material fact exist as to whether Felkner's activities were protected by the First Amendment. If Felkner is able to clear that first hurdle, clearly factual issues abound with respect to whether his conduct was a "substantial or motivating factor for the adverse" actions allegedly taken against him by defendants. *McCue*, 807 F.3d at 338 (quoting *Padilla-García*, 212 F.3d at 74). He may rely on circumstantial evidence to prove this second prong of his retaliation claim. *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003) (stating that, in cases where parties' motivations are at issue, the "so-called smoking gun[,]" or direct evidence, is not required). Examples of actions that can give rise to an inference of the required causal nexus include: temporal proximity between the speech and the adverse action; ongoing actions of antagonism; inconsistent justifications for an adverse action; and any evidence of conduct

- 22 -

between the time of the speech and the adverse action from which the totality of the circumstances can give rise to a reasonable inference that the adverse action was taken in response to the speech. *Id.*; *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Accordingly, we affirm the judgment as to count two with respect to Felkner's claim that defendants retaliated against him for exercising his First Amendment right to record classroom discussions and his conversations with faculty members. We also hold, however, that defendants are not entitled to judgment as a matter of law on Felkner's remaining claims of retaliatory actions because there are genuine issues of material fact regarding whether defendants retaliated against Felkner for expressing his political beliefs.

**4**

**Compelled Speech**

Felkner also alleges that defendants violated his right to freedom of speech and expression by "compell[ing] [him] to express ideas that are contrary to his political beliefs." Before us, Felkner argues that he has made a prima facie claim for compelled speech in violation of his First Amendment rights, but he does not specify the speech he claims was compelled. The hearing justice focused on Felkner's allegations that Professor Ryczek compelled him to espouse a political viewpoint contrary to his own when Felkner was not permitted to switch sides of a project topic.

We start off by noting that, on summary judgment, the issue is not whether a litigant has established a prima facie claim to his stated cause of action, but rather, whether he has demonstrated the presence of genuine issues of material fact to be resolved by a factfinder. We also note that, to the extent Felkner alleges that a requirement of the "Policy and Organizing"

course curriculum was to lobby the General Assembly, the issue is moot. There is no dispute that, although Professor Ryczek initially told Felkner he would be required to lobby from a perspective contrary to his own views, Felkner never was compelled to lobby or testify at a public hearing. The question, therefore, is more appropriately whether the "speech" required by his class assignments, integrative project, and other educational activities were reasonably related to legitimate pedagogical concerns or, as Felkner contends, either an impermissible form of compelled speech or a "pre-text[] for political discrimination." *See Hazelwood*, 484 U.S. at 273. As we have previously indicated, based on our *de novo* review and in the context of this case, this inquiry is more amenable to resolution by a factfinder than to summary judgment. We therefore vacate the entry of summary judgment on count three of Felkner's amended complaint.

**5**

**Unconstitutional Conditions**

In count four, Felkner invokes the unconstitutional conditions doctrine, under which the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Felkner argues that "[d]efendants' actions placed unconstitutional conditions upon [him] and attempted to compel him to change his political beliefs as a condition of obtaining his master's degree."

> "The doctrine of unconstitutional conditions bars government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all. * * *
>
> "Not all conditions are prohibited, however; if a condition is germane—that is, if the condition is sufficiently related to the benefit—then it may validly be imposed. In the final analysis, the legitimacy of a governmental proposal depends on the degree of relatedness between the condition on a benefit and the reasons why

government may withhold the benefit altogether." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995) (internal citations omitted).

For the reasons we have stated above, including a record rife with disputed, material facts, we conclude that count four is not amenable to summary disposition, and we therefore vacate the entry of summary judgment on Felkner's unconstitutional conditions claim.

**6**

**Equal Protection**

In count five, Felkner alleges that defendants "treated [him] differently than similarly situated graduate students[,]" discriminated against him, and violated his right to equal protection under the law by "denigrating [his] beliefs, penalizing his grades, trumping up ethics charges against him, delaying his graduation, and denying him the opportunity to work on welfare reform in the Governor's Office[,]" actions that were allegedly taken in retaliation for exercising the right to express himself as he wished. The hearing justice focused her analysis on the grading process and result in the "Policy and Organizing I" course and concluded that Felkner, as a class of one, had not demonstrated he was treated differently from similarly-situated students because the undisputed facts showed Professor Ryczek had not previously disaggregated a group grade or needed to ask for another faculty member's input during the grading process.

Before us, Felkner argues that the hearing justice ignored evidence that other students with conservative sociopolitical viewpoints similar to his were affected by defendants' intolerance of conservative ideologies. Felkner points to emails with classmates demonstrating that they either did not speak up in class or did speak up about their personal views and ideologies but not with the same resulting poor grades and consequences as Felkner.

- 25 -

"The Equal Protection Clause requires states to treat alike all persons similarly situated."[15] *Toledo v. Sánchez*, 454 F.3d 24, 33 (1st Cir. 2006) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "Unless state action burdens a suspect class or impinges upon a fundamental right, we review equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose." *Id.* (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Because Felkner is not alleging discrimination based on his membership in a suspect class and because education is not a fundamental right under the United States Constitution, *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35 (1973), he must ultimately demonstrate that defendants' conduct was "irrational and not motivated by any conceivable legitimate reason." *Toledo*, 454 F.3d at 33. In our opinion, Felkner has failed to demonstrate any disputed fact regarding whether defendants' actions toward him were "irrational and not motivated by any conceivable legitimate reason." *Id.*

The hearing justice considered Felkner as a "class of one." The United States Supreme Court has recognized that a plaintiff can prevail on a claim that he "has been irrationally singled out as a so-called 'class of one'" rather than as a member of a larger "identifiable group" because the Equal Protection Clause is fundamentally concerned about arbitrary government classification. *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 601, 602 (2008). In *Engquist*, the Supreme Court discussed the case of *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), in which a property owner had been properly considered a class of one when she pursued a claim for an equal protection violation after her municipality conditioned approval for a connection to reach a municipal water supply on the grant of a larger easement

---

[15] The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

than that required for other similarly situated property owners. *Id.* at 601-02; *see Olech*, 528 U.S. at 563. The Supreme Court cautioned in *Engquist*, however, against undermining the discretionary decisionmaking inherent in some contexts by mistaking an exercise of discretion for an act of discrimination simply because one person has been treated differently from others who are similarly situated. *Id.* at 603. Indeed, the Supreme Court held in that case that the class-of-one theory was not cognizable in the public employment context, *id.* at 605, and the First Circuit Court of Appeals has extended that reasoning limiting the application of the class-of-one theory to other arenas. *See, e.g.*, *Caesars Massachusetts Management Company, LLC v. Crosby*, 778 F.3d 327, 336 (1st Cir. 2015) (recognizing *Engquist* and declining to apply the class-of-one theory to the context of licensure for operating a casino).

Similar to the context of employment, the educational realm is replete with discretionary decisions. Individual professors have the necessary authority to evaluate their students' work and to assign a grade for their students' performances on the assignments required for successful course and degree program completion. Administrators have the authority to set the academic requirements for completing specific degree programs. In our opinion, the class-of-one theory is not applicable to Felkner's equal protection claim arising out of his educational experience for the same reasons discussed by the Supreme Court when it declared that the theory was not applicable to an equal protection claim arising out of an employment experience. *See Engquist*, 553 U.S. at 605 ("To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship."). Moreover, Felkner himself has neither relied on the class-of-one theory nor suggested that we consider his equal protection claim pursuant to this framework.

Notably, the First Circuit's jurisprudence on equal protection claims in the context of postsecondary education clearly focuses on whether a defendant's actions have been different toward plaintiffs compared to other students and whether the disparate treatment has been rationally related to a legitimate purpose. For example, a student teacher's equal protection claim against his university and the city in which he had been engaged in a student-teaching practicum was summarily dismissed because the plaintiff had "failed to show that others, similarly situated, were treated differently." *Hennessy v. City of Melrose*, 194 F.3d 237, 244 (1st Cir. 1999). In *Toledo*, the First Circuit also affirmed the dismissal of an equal protection claim because a university student who had claimed a disability by virtue of a mental illness had failed to allege that the university's refusal to acquiesce to his demands for class scheduling and course assignment changes to accommodate his disability was a result of irrational prejudice, and the university's decisions were obviously rationally related to its academic mission and budgetary constraints. *Toledo*, 454 F.3d at 29, 33-34.

Felkner asserts that some of his peers who held similar sociopolitical ideologies also did not speak up in class to share these views. The email exchanges with these students that Felkner provided as support for his argument do not show that defendants treated students with conservative ideologies differently than they treated students with liberal ideologies; instead, the emails simply provide evidence to support Felkner's claim that some other students felt that their sociological and political opinions should not be shared with the other students and faculty in the MSW program. This assertion is clearly more relevant to Felkner's claims based on freedom of expression than to claims based on equal protection violations.

Felkner also relies on a mosaic of allegations about the various professors and administrators whose actions against him—he claims—tend to show a pattern of disparate

treatment due to his political affiliation. As litigants are apt to do, Felkner cherry-picks from the myriad written communications between him and fellow students, as well as between him and RIC professors and administrators, in his attempt to demonstrate that defendants' actions were motivated by their disagreement with his political ideology. Our review of the record of this case, however, shows that the academic actions taken with respect to Felkner were, ultimately, to enforce the required components of the MSW degree at RIC. Felkner focuses on Professor Ryczek disaggregating his grade and giving him a failing grade when he refused to complete an assignment as instructed, various professors and administrators enforcing the requirement that Felkner complete both a field placement and an integrative project as a prerequisite to obtaining the MSW degree, and administrators denying Felkner a further extension of time in which to complete the integrative project after he failed to respond to the SSW's offer for completing the project long after the previous deadlines set for him. In our view, these are actions that involve "discretionary decisionmaking" that do not implicate equal protection concerns. *Engquist*, 553 U.S. at 603.

Accordingly, we affirm summary judgment with respect to count five.

**7**

**Procedural Due Process**

In count six, Felkner alleges that defendants violated his procedural due process rights in several different ways related to the ASC hearings. The hearing justice concluded that Felkner had been provided with sufficient opportunity to challenge the complaints against him as well as to address his own complaints before the ASC, and that the ASC carefully decided the outcome of each complaint filed with it related to Felkner. On appeal, Felkner argues that he was not provided with sufficient process. The defendants, for their part, argue that Felkner received the

notice and opportunity to which he was entitled and that the ASC process was not deficient in any way.

The United States Supreme Court has recognized a "legitimate entitlement to a public education as a property interest * * * protected by the Due Process Clause[,] which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause," *Goss v. Lopez*, 419 U.S. 565, 574 (1975), namely, "notice and opportunity for hearing appropriate to the nature of the case," *id.* at 579 (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313 (1950)).

> "The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards. * * *
>
> "The Due Process Clause also forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." *Id.* at 574 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).

"Due process, which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation." *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) (citing *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976); *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)).  The span of procedural protections required to ensure fairness to students, aside from the right to notice and hearing, is uncertain, and must be determined on a case-by-case basis by balancing the competing interests in each case. *Id.* at 13.  The First Circuit in *Gorman* explained that we must balance the "paramount" interest students hold "in completing their education, as well as avoiding unfair or mistaken exclusion from the educational

environment, and the accompanying stigma" against the promotion and protection of educational institutions. *Id.* at 14.

At a minimum, a student is entitled to know "what he is accused of doing and what the basis of the accusation is." *Goss*, 419 U.S. at 582. In the context of a student disciplinary action, the Supreme Court has specifically "stop[ped] short of construing the Due Process Clause to require * * * that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583; *see also Gorman*, 837 F.2d at 12 (concluding that disciplinary actions taken against students implicate students' liberty and property interest in education and, therefore, require due process).

Although it is not entirely clear to us that Felkner's hearing before the ASC was disciplinary in nature, we shall assume that it was, thereby implicating his liberty and property interests. Before us, Felkner alleges six specific violations of his procedural due process rights:

> "(1) to adequate notice of Pearlmutter's complaint by not informing him of the critical 'assumption' upon which the ASC would base its decision, i.e., that he had been told that tape-recording faculty and students was 'unethical'; (2) to counsel for the hearings; (3) by engaging in *ex parte* communications; (4) by denying him the right to question his accusers at all the hearings; (5) by depriving him of a record for a meaningful appeal[;] and (6) by providing him with meaningless appeals that consisted only of 'rubber-stamping' the ASC's decision."

We discuss Felkner's contentions *seriatim*.

We start with the adequacy of Felkner's notice of Professor Pearlmutter's complaint to the ASC. Felkner received a letter advising him of Professor Pearlmutter's complaint and the date of the hearing. Professor Pearlmutter's complaint and other materials were enclosed with this notice. A review of these materials shows that Felkner was undisputably told the basis for

the complaint against him, *see Goss*, 419 U.S. at 582, and Felkner has not provided any material to the contrary. The fact that the notice did not include an express statement of permitted and unpermitted behavior by SSW students does not lead to a violation of Felkner's due process rights regarding his entitlement to notice prior to the ASC hearing.

Second, Felkner claims he was deprived of his right to have counsel at the ASC hearing. He does not direct us, however, to any authority establishing a right to counsel in similar academic circumstances. Indeed, "the weight of authority is against representation by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question." *Gorman*, 837 F.2d at 16.

Third, Felkner's challenge regarding "*ex parte* communications"—referring to the deposition of Diane Martell, Ph.D., chair of the ASC, in which she testified that Dean Bennett-Speight asked Dr. Martell to assure her that Felkner would be treated fairly and that all the policies and practices would be followed—fares no better. It is difficult to see how this particular communication might compromise Dr. Martell's impartiality, and Felkner has not demonstrated a factual issue to be resolved by a jury.

Fourth, we address Felkner's claim that he was denied the opportunity to question his "accusers" at the ASC hearing. Although the MSW Academic and Field Manual expressly provides a student at an ASC hearing with "the right to question all participants on pertinent matters[,]" the failure to adhere to that policy is not necessarily of constitutional magnitude because Felkner did not have a constitutional right to confront and cross-examine Professor Ryczek as his accuser. *See Goss*, 419 U.S. at 583. Moreover, Felkner has not shown any material, disputed facts for a factfinder to resolve on this point.

Lastly, as to Felkner's assertion about a "meaningless appeal" resulting from the absence of a formal record of the ASC hearings and alleged "rubberstamp" of the ASC's decisions, we note that courts have held that due process does not mandate that a student be afforded an opportunity to appeal from an adverse decision at a disciplinary proceeding. *See Flaim v. Medical College of Ohio*, 418 F.3d 629, 642 (6th Cir. 2005) (citing *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 428-29 (7th Cir. 1996); *Winnick v. Manning*, 460 F.2d 545, 549 n.5 (2d Cir. 1972)). While a record of an academic disciplinary proceeding is desirable and may be required by individual educational institutions as part of the process provided, *see Gorman*, 837 F.2d at 15, 16, Felkner has not demonstrated any disputed, material facts to resolve regarding whether the process here was constitutionally insufficient.

In summary, Felkner has failed to establish any factual disputes with respect to his procedural due process claims and has also failed to establish that defendants are not entitled to judgment as a matter of law on these claims. The undisputed facts and persuasive federal law lead us to hold that Felkner received adequate notice and opportunity to be heard before the ASC. We therefore affirm the judgment with respect to count six.

## 8

### Conspiracy

Felkner alleges that defendants conspired to deny him his constitutional rights to freedom of speech and due process "on account of his political beliefs" in violation of 42 U.S.C. § 1985(3). The hearing justice concluded Felkner had not alleged "a racial or class-based animus as motivation for the alleged conspiracy" as required by federal law and, as a result, defendants were entitled to judgment as a matter of law on Felkner's conspiracy claim. On appeal, Felkner argues that a conspiracy to "deprive [him] of his constitutional rights and drive him out of the

MSW program" could reasonably be inferred by the evidence presented in Superior Court that: (1) members of the faculty discussed Felkner on several occasions[16]; (2) Professor Ryczek kept notes about Felkner and had other faculty members review a paper on which he was going to give Felkner a bad grade; and (3) Professor Mueller testified in his deposition that the ASC had not found that Felkner violated the NASW Code of Ethics but Dr. Martell stated that the ASC unanimously found Felkner had violated the code because the ASC tried to reach a consensus.

Felkner's argument, however, misses the mark entirely. To prove a claim under § 1985(3),[17] a plaintiff must demonstrate:

> "(1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*,

---

[16] Specifically, Felkner alleges the following: Professor Ryczek discussed Felkner in a management committee and faculty meeting; Professor Pearlmutter spoke about Felkner at a faculty meeting; Professor Weisman discussed Felkner with almost every faculty member; Professor Mildred Bates informed Dean Bennett-Speight of Felkner's resistance to conforming with course requirements; and Dr. Martell admitted that the faculty discussed Felkner.

[17] 42 U.S.C. § 1985(3) provides, in relevant part:

> "If two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

83 F.3d 1, 3 (1st Cir. 1996) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

We have previously acknowledged that a valid claim pursuant to § 1985(3) must include an allegation "that a conspiracy was not only established to deprive the claimant of the equal protection and privileges or immunities of the law but also was predicated upon a racial or suspect class-based, invidiously discriminatory animus." *Salisbury v. Stone*, 518 A.2d 1355, 1361 (R.I. 1986) (citing *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 828-29 (1983)) (holding that the plaintiff failed to state a claim when he did not allege his dismissal from employment was "the act of a conspiracy motivated by racial or class-based animus"); *see also Hennessy*, 194 F.3d 237, 244 (1st Cir. 1999) (holding that a student teacher's conspiracy claim against his undergraduate school and field-placement teaching school "founder[ed]" because he had "made no showing that the defendants' conduct originated in an invidiously discriminatory class-based animus"). The First Circuit is clear "that a class is cognizable for purposes of § 1985(3)'s class-based animus requirement only when it is comprised of a distinctive and identifiable group." *Aulson*, 83 F.3d at 5. The First Circuit has declined an opportunity to extend the protection against conspiracy to classes based on political affiliation, holding "that § 1985(3) provides no remedy for animus on the basis of political beliefs." *Pérez-Sánchez v. Public Building Authority*, 531 F.3d 104, 108, 109 (1st Cir. 2008) (acknowledging the Sixth Circuit's opinion in *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973), that supporters of a political candidate are a clearly defined class entitled to protection under § 1985(3) but also collecting other federal circuit court cases holding that political affiliation is not a class entitled to protection).

Felkner's conspiracy claim is based entirely on the cause of action created by § 1985(3), yet he has not alleged that the deprivation of his constitutional rights stemmed from an

"invidiously discriminatory animus" directed at a class entitled to protection under this statute. *See Aulson*, 83 F.3d at 3; *Salisbury*, 518 A.2d at 1361; *see also Diva's Inc. v. City of Bangor*, 411 F.3d 30, 39 (1st Cir. 2005) (holding appellants failed to state a claim for conspiracy pursuant to § 1985(3) and any presumed class inferred from the facts would be "at best, a vague and amorphous grouping of individuals" and therefore insufficient for stating class-based animus) (internal quotation marks omitted). Accordingly, defendants are entitled to judgment as a matter of law on Felkner's conspiracy claim and we therefore affirm the judgment as to count seven.

## C

### Qualified Immunity

In defendants' renewed motion for summary judgment, they argued that the doctrine of qualified immunity barred Felkner's claims against them. After the hearing justice determined that defendants were entitled to summary judgment on all of Felkner's claims, she declined to consider defendants' argument that they were qualifiedly immune from the claims. Instead, she found this issue to be moot. In a cursory manner before us, Felkner asserts that two of the individually named defendants are not entitled to qualified immunity. Felkner also acknowledges that the hearing justice did not address this issue. The defendants, for their part, have asked us—if we vacate the judgment the hearing justice entered in their favor—to conclude that qualified immunity bars Felkner's claims against them. The defendants argue that, even if their actions are deemed to have violated any of Felkner's constitutional rights, none of the violations were against clearly established constitutional rights, thereby entitling the individual defendants to qualified immunity.

While defendants have presented their qualified immunity arguments to the trial court on three separate occasions, there is no dispute that a hearing justice has yet to substantively

consider these arguments. We have held that genuine issues of material fact preclude summary judgment in defendants' favor on several of Felkner's claims, but we decline defendants' invitation to consider or decide whether the potential violations of Felkner's constitutional rights were violations of clearly established rights because we generally do not opine on legal issues that have not been explored and analyzed in the first instance by the trial court. *See Pontarelli v. Rhode Island Board Council on Elementary and Secondary Education*, 151 A.3d 301, 307 n.5 (R.I. 2016); *State v. Gaylor*, 971 A.2d 611, 614-15 (R.I. 2009). Part of the Superior Court's task on remand will be, therefore, to consider whether any of the defendants are entitled to qualified immunity, should defendants continue to press this argument.

## D

### Punitive Damages

Felkner also asserts that the hearing justice erred when she granted defendants' motion to strike his demand for punitive damages. As previously recounted, Felkner sought punitive damages for defendants' alleged infringement of his right to exercise freedom of speech and for delaying his completion of the MSW degree program. In response to a request for interrogatories seeking the individual defendants' personal financial details, defendants moved to strike Felkner's claim for punitive damages. After conducting a *Palmisano* hearing, the hearing justice found that defendants' conduct toward Felkner had not "rise[n] to the level of recklessness or callous indifference" to his constitutional rights and therefore concluded that he had not established the required prima facie case for punitive damages. Felkner argues that he did establish a prima facie case for punitive damages because the record demonstrates that defendants, by their actions, were either recklessly or callously indifferent to his constitutional

rights. The defendants, not surprisingly, argue that the hearing justice did not err in her decision to grant their motion to strike Felkner's punitive damages claim.

We must first determine what standard applies to our review of this issue. Felkner seems to suggest we should review this issue *de novo*, applying the summary judgment framework in which we view the undisputed facts in the light most favorable to him. The defendants suggest we reverse the hearing justice's ruling only if we hold that her findings of fact and ultimate decision to strike the punitive damages claim were clearly erroneous. "*Palmisano* established a procedure whereby a plaintiff must make a prima facie showing at an evidentiary hearing that a viable claim exists for an award of punitive damages before discovery of defendant's financial worth may be undertaken." *Castellucci v. Battista*, 847 A.2d 243, 247 (R.I. 2004) (footnote omitted). Our caselaw is clear that the trial justice determines, as a matter of law, "[w]hether a party seeking punitive damages has met the high standard imposed on such an award[.]" *Palmisano*, 624 A.2d at 318; *see also Castellucci*, 847 A.2d at 248; *Simeone v. Charron*, 762 A.2d 442, 444 (R.I. 2000). "Such findings on questions of law are reviewed *de novo* by this Court." *Simeone*, 762 A.2d at 444. Accordingly, we proceed with a *de novo* review of this issue.

Punitive damages are available in an action brought pursuant to 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). In order to recover punitive damages under Rhode Island law, a plaintiff must present "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounts to criminality, which for the good of society and warning to the individual, ought to be punished." *Palmisano*, 624 A.2d at 318 (alteration omitted) (quoting *Sherman v. McDermott*, 114 R.I. 107,

109, 329 A.2d 195, 196 (1974)). Also, "there must be a showing that the defendant acted with malice or in bad faith." *Id.* This standard "is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." *Id.* (citing *Davet v. Maccarone*, 973 F.2d 22, 27 (1st Cir. 1992)). We have previously commented that "[a]n award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits." *Id.*

In Felkner's objection to the defendants' motion to strike his claim for punitive damages, he provided dozens of pages of allegations against both individually named defendants and unnamed individuals he alleges acted as coconspirators. After reviewing these allegations, the hearing justice's decision on the motion, and Felkner's arguments before this Court, it is evident that, despite the sheer volume of allegations, the substance of his claims against each individual does not reveal either "evil motive or intent" on their part or their "reckless or callous indifference" to his federal constitutional rights. *Kolstad*, 527 U.S. at 536 (quoting *Smith*, 461 U.S. at 56). The hearing justice made an exhaustive and meticulous review of the abundant exhibits before she concluded that Felkner had not met his burden to demonstrate a prima facie case for punitive damages. Based upon our *de novo* review of the record, we agree with the hearing justice. Accordingly, we affirm the order granting the defendants' motion to strike Felkner's claim for punitive damages.

## III

### Conclusion

For the reasons stated herein, we vacate the judgment of the Superior Court with respect to counts one, three, and four. We affirm the judgment with respect to counts five, six, and

seven.  As to count two, we affirm the judgment as it relates to Felkner's claim that the defendants retaliated against him for his audio recordings, and we vacate the judgment in all other respects.  We also affirm the order striking Felkner's claim for punitive damages.  We remand this case to the Superior Court for further proceedings consistent with this opinion.

**Justice Robinson, concurring in part and dissenting in part**.  I am pleased to concur in the opinion of the majority to the extent that it affirms the grant of summary judgment in favor of the defendants.  However, I believe that the trial justice's grant of summary judgment should be affirmed in its entirety, and I therefore vigorously dissent from those portions of the majority opinion that result in the vacating of summary judgment as to certain counts.

I strive never to lightly or unreflectively dissent.  And that is especially true with respect to a case such as this one, where plaintiff has alleged that he has been mistreated in a manner that violated certain core constitutional rights.  Nonetheless, while being fully cognizant of the seriousness of my decision, I know that I must dissent in this case—respectfully, but most ardently.[1]

I have never for a moment faltered in my long-held reverence for the First Amendment, nor am I even remotely retreating from that reverence at this time.  However, from the beginning, I have been unable to glimpse any genuine First Amendment issue in the facts of record in this case.  It is my considered judgment that this case involves at bottom nothing more than some petty academic squabbles and certainly nothing of constitutional magnitude.  I submit that the following words of Judge Calvert Magruder, written in a famous law review article (published before his appointment to the bench), are pertinent to the case at bar and to plaintiff's

---

[1]     I sincerely acknowledge the thoughtful nature of the majority opinion and that of my esteemed colleague who concurs in part with the majority opinion and dissents in part from it.

grievances in general: "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1035 (1936); *cf. Craig v. Harney*, 331 U.S. 367, 376 (1947) ("Judges are supposed to be [persons] of fortitude, able to thrive in a hardy climate."); *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995) ("[R]obust debate among people with different viewpoints * * * is a vital part of our democracy * * *.").[2]

Let me state at the outset that I am in full agreement with the reasoning of and the conclusions reached in the comprehensive opinion of the hearing justice, and I certainly concur with those portions of the majority opinion that affirm her rulings. I feel no need to add a great deal to what I consider to be an impressive, insightful, and intellectually compelling piece of

---

[2] Moreover, although written in the context of the workplace rather than with respect to academia, there is profound common sense and wisdom in the following observation by Judge Bruce Selya in the case of *Suarez v. Pueblo International, Inc.*, 229 F.3d 49 (1st Cir. 2000):

> "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez*, 229 F.3d at 54; *see also Cherkaoui v. City of Quincy*, 877 F.3d 14, 30 (1st Cir. 2017).

I would add that, in my view, this entire case comes close to running afoul of the ancient maxim "*de minimis non curat lex*." As I have studied the record in this case as well as the majority opinion of this Court, I frequently recall the following observation by a federal appellate court:

> "The maxim *de minimis non curat lex* retains force even in constitutional cases * * *. Its particular function is to place outside the scope of legal relief the sorts of intangible injuries normally small and invariably difficult to measure that must be accepted as the price of living in society rather than made a federal case out of." *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993); *see generally* Max L. Veech & Charles R. Moon, *De Minimis Non Curat Lex*, 45 Mich. L. Rev. 537 (1947).

reasoning by the hearing justice in her meticulous and point-by-point rejection of Mr. Felkner's objection to defendants' so well-crafted and convincing motion for summary judgment. At the end of the day, it is my unwavering conclusion that no aspect of this case needs to be remanded for a trial. In my judgment, the case was correctly disposed of at the *nisi prius* level pursuant to the established procedures and criteria under Rule 56 of the Superior Court Rules of Civil Procedure.

While it is true that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), it is equally true that "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Indeed, the Supreme Court has stated that, "[w]hen judges are asked to review the substance of a genuinely academic decision, * * * they should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). It is my considered and precedent-supported belief that, except in perhaps the most truly exceptional circumstances (which do not even remotely exist in the instant case), a court is not "suited to evaluate the substance of the multitude of academic decisions * * *—decisions that require an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 226 (internal quotation marks omitted).

As such, I must express my fervent dissent from those portions of the majority opinion which reverse the hearing justice's grant of summary judgment in this case—*i.e.*, those portions

which take issue with the hearing justice's grant of summary judgment as to Counts One through Four of Mr. Felkner's first amended complaint.[3] I now proceed to address the reasons for my disagreement with the majority concerning these four counts.

Count One of Mr. Felkner's first amended complaint alleged that he was deprived of his right to freedom of expression[4] "on issues of political concern." Count Two contended that he was retaliated against for his public criticism of Rhode Island College (RIC). Count Three averred that Mr. Felkner was unconstitutionally compelled "to express ideas that are contrary to his political beliefs." Lastly, Count Four posited that defendants' actions placed unconstitutional conditions on Mr. Felkner with respect to his obtaining the master's degree. In addressing these four counts, I deem it more expedient to proceed, as the hearing justice did in this case, by looking at each act which Mr. Felkner contends was a violation of his constitutional rights as set forth in the first four counts in the first amended complaint.

I begin by noting that I am in agreement with the majority with respect to identifying the principles of law that are pertinent to this case. It is certainly the case, as the majority states, that the First Amendment protects an individual "who chooses to speak" as well as the right of an individual to decide what not to say, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995); and it is also true that "constitutional freedom is nowhere more vital than in the community of American schools." *Tinker*, 393 U.S. at 512 (internal quotation marks omitted). What is more, I also find applicable the decision of the United States Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988),

---

[3] I note that the majority does uphold summary judgment on Count Two, but it does so only with respect to Mr. Felkner's alleged right to record his classes and his discussions with members of the faculty.

[4] For the purposes of this dissenting opinion, I do not suggest that there is any material difference between the term "freedom of expression" and the term "freedom of speech."

to the effect that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood School District*, 484 U.S. at 273; *see also Brown v. Li*, 308 F.3d 939, 951-52 (9th Cir. 2002) (addressing the *Hazelwood School District* standard and stating that it "balances a university's interest in academic freedom and a student's First Amendment rights [since] [i]t does not immunize the university altogether from First Amendment challenges but, at the same time, appropriately defers to the university's expertise in defining academic standards and teaching students to meet them").

With respect to Count Two, I also do not take issue with the majority that, to prevail on a First Amendment retaliation claim, Mr. Felkner must show that he "engaged in constitutionally protected conduct" and that such "conduct was a substantial or motivating factor" for any adverse action which was taken against him. *McCue v. Bradstreet*, 807 F.3d 334, 338 (1st Cir. 2015) (internal quotation marks omitted). And I am in agreement that he was free to rely on circumstantial evidence in an attempt to prove his retaliation claim. *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003). Lastly, with respect to Count Four, I am in agreement that "[t]he doctrine of unconstitutional conditions bars government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995). Nonetheless, a condition that is "sufficiently related to the benefit" may "validly be imposed." *Id.*

Where I part company with the majority is in its determination that genuine issues of material fact remain with respect to the alleged deprivation of Mr. Felkner's First Amendment

rights. I endorse wholeheartedly the hearing justice's decision to the contrary. I find her discussion of Mr. Felkner's free speech claims to be an exemplary piece of legal scholarship and absolutely correct. As such, I will not restate that analysis but rather briefly address why I arrive at the same conclusions as the hearing justice.

Initially, I note that I am in agreement with the hearing justice that, "[w]ith respect to the alleged violations of free speech, the Court first must determine whether the speech in question was protected under the First Amendment as a matter of law." In *Adler v. Lincoln Housing Authority*, 544 A.2d 576 (R.I. 1988), this Court opined that "[t]he inquiry into the protected status of speech is one of law, not fact." *Adler*, 544 A.2d at 581 (internal quotation marks omitted). In addition, the United States Court of Appeals for the Sixth Circuit has expressly stated that "[t]he only real question, under *Hazelwood*," as to "whether the actions of the school officials were reasonably related to legitimate pedagogical concerns * * * is a question of law." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989) (internal quotation marks omitted). Thus, in my considered opinion, the question of whether or not Mr. Felkner's speech was protected under the First Amendment is a question of law.

Mr. Felkner first alleges that Professor James Ryczek, in part one of the "Policy and Organizing" class, violated his free speech rights when he provided an approved list of topics concerning which students were to lobby, which topics Mr. Felkner alleges represented a "leftist position." Mr. Felkner further complains that he was not permitted to switch topics and that he was given a failing grade when he wrote his paper from an opposite perspective. In my view, the hearing justice did not err in concluding that the record reflected the fact that Mr. Felkner chose a topic for a paper and debate, wanted to switch sides late in the course—and then, ignoring the professor's pedagogically appropriate refusal to let him do so, wrote the paper and participated in

- 45 -

the group debate from a perspective opposite to that assigned. It is certainly a legitimate pedagogical purpose for a professor to require a student to write a paper or participate in a debate from a viewpoint that may conflict with that student's personal views; learning to understand and cogently articulate a viewpoint that is not one's own is without question a legitimate pedagogical purpose. *See Hazelwood School District*, 484 U.S. at 273; *C.N. v. Ridgewood Board of Education*, 430 F.3d 159, 187 (3d Cir. 2005) ("First Amendment jurisprudence recognizes that the educational process itself may sometimes require a state actor to force a student to speak when the student would rather refrain. A student may also be forced to speak or write on a particular topic even though the student might prefer a different topic."); *Brown*, 308 F.3d at 953 ("[A] teacher may require a student to write a paper from a particular viewpoint, even if it is a view-point [*sic*] with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose."); *see also Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 242-43 (2000) (Souter, J., concurring) (stating that, in a university setting, "students are inevitably required to support the expression of personally offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach"); 2 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 17:1.50 at 17-8 to 17-10 (2018) ("Schools routinely require students to express a viewpoint that is not their own in order to teach the students to think critically.").

Taking into account the just-cited legal authorities, Mr. Felkner was justifiably given a failing grade. *See Brown*, 308 F.3d at 949 ("[T]he First Amendment does not require an educator to change the assignment to suit the student's opinion or to approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard."). What is more, the hearing justice pointed out that Professor Ryczek, quite generously, even gave Mr.

Felkner the opportunity to resubmit the assignment, but Mr. Felkner opted not to do so. Thus, in my judgment, the hearing justice certainly did not err in concluding that Mr. Felkner's free speech rights were not violated by the series of events that transpired in this case. Nor did she err in concluding that Mr. Felkner's free speech rights were also not violated when his appeal of his failing grade was eventually denied. In the just-described context, Mr. Felkner was not engaging in protected speech. *See Adler*, 544 A.2d at 581.

Mr. Felkner also puts great weight on the fact that, in part two of his "Policy and Organizing" class, he was required to participate in a lobbying assignment concerning a topic with which he did not agree. As the majority notes, this issue is utterly moot given that Mr. Felkner was never required to actually lobby anyone with respect to a viewpoint that he did not share. This complaint on Mr. Felkner's part is completely devoid of any merit. So too is his contention with respect to Professor Roberta Pearlmutter's initial statement that she would reduce his grade on the lobbying assignment if he formed his own group with students who were not fellow students in the "Policy and Organizing" class. As the hearing justice noted, Mr. Felkner was in fact eventually allowed to form his own group. Therefore, I perceive no error in the hearing justice's conclusion that Mr. Felkner's free speech rights were not violated in this regard.

The same is likewise true of Mr. Felkner's contention that he was not permitted to engage in the field placement that he chose or to work on the topic of welfare reform for his integrative project. Once again, I am in agreement with the hearing justice that it is clear from the record that Mr. Felkner was ultimately permitted to do the field placement he chose and to work on welfare reform for his integrative project. Therefore, these claims also have no merit. *See, e.g.*, *Beauregard v. Gouin*, 66 A.3d 489, 494 (R.I. 2013) (stating that a "[c]omplete failure of proof

- 47 -

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

Moreover, with respect to the delay resulting from Mr. Felkner's seeking approval of the field placement and integrative project topic that he wanted, the hearing justice pointed out that he was given an extension of time within which to complete his integrative project. As the hearing justice noted, Dean Carol Bennett-Speight granted Mr. Felkner an extension to complete his degree requirements on the condition that he submit his problem statement and methodology to his advisor by a certain date and submit a plan outlining how he would finish the project by a certain date. Dean Bennett-Speight expressly required Mr. Felkner to acknowledge his understanding and acceptance of these conditions. The hearing justice is correct that the record reflects that Mr. Felkner inexplicably failed to do so. After he had been given ample time to comply with the just-referenced condition precedent, Professor Pearlmutter informed him that he was no longer considered to be a student in the social work program at RIC. In my opinion, it could be convincingly contended that Mr. Felkner's complete and bewildering failure to take advantage of the proffered extension is nearly determinative of this entire case. Mr. Felkner was given the opportunity to finish his integrative project as a stepping stone towards being granted a master's degree, and he did not make even the minimal effort of informing RIC as to whether or not he was accepting the extension and its conditions. Therefore, in my opinion, it was through the fault of no one but himself that Mr. Felkner did not ultimately obtain a master's degree.

With respect particularly to Mr. Felkner's retaliation claim, the hearing justice did not err in concluding that, as to the just-discussed occurrences, Mr. Felkner was unable to show that he was engaged in constitutionally protected speech; that being the case, any retaliation claim must fail. *See McCue*, 807 F.3d at 338. Mr. Felkner further alleges, in regard to his retaliation claim,

that Professor Pearlmutter penalized him with respect to his grade in her class due to the fact that he worked with students who were not fellow students in his class. However, grading is a function of the often somewhat subjective assessment criteria of a particular professor, and this Court is not in a position to second-guess such a decision. *See Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978) (stating that "the decision of an individual professor as to the proper grade for a student in his [or her] course * * * requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial * * * decisionmaking"); *see also Settle v. Dickson County School Board*, 53 F.3d 152, 156 (6th Cir. 1995) ("Teachers * * * must be given broad discretion to give grades and conduct class discussion based on the content of speech.").

Mr. Felkner next posited in his first amended complaint that he was retaliated against for his conservative views when Professor Pearlmutter "led a fifty-minute in-class discussion assailing Mr. Felkner's conservative views" and "allowed other students to assault Mr. Felkner's views without allowing him to respond." In my judgment, the hearing justice was absolutely correct when she held that this simply is not an adverse action. *See McCue*, 807 F.3d at 338-39. As such, Mr. Felkner's retaliation claim in this regard also must fail. I would echo the hearing justice's perceptive statement that Mr. Felkner "seems to consider free speech a one-way street." I believe that that assessment is also applicable to Mr. Felkner's complaint about various e-mail communications he had with RIC professors wherein they stressed the progressive nature of the School of Social Work. Mr. Felkner's free speech rights were not violated simply because professors at RIC disagreed with him politically and were vocal about their own views.

I also note that, even accepting as true the contents of the affidavit of Dr. Richard Gelles, on which the majority so heavily relies, I can perceive nothing in this case on which to base a

legal conclusion that defendants' actions were not reasonably related to any legitimate pedagogical purpose but rather were pretextual. *See Hazelwood School District*, 484 U.S. at 273; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004). Even if the master's in social work program did have, as the majority puts it, a "strong predisposition toward so-called 'progressive' social values," expressing those values and allowing class discussion on those values rather than fostering a more conservative perspective certainly did not violate Mr. Felkner's constitutional rights. *See Brown*, 308 F.3d at 951 ("[T]he curriculum of a public educational institution is one means by which the institution itself expresses its policy, a policy with which others do not have a constitutional right to interfere."). While Mr. Felkner was required to argue against his personal viewpoint in class, it is important to remember that he was ultimately not required to lobby for any viewpoint with which he did not agree. Moreover, I consider it absolutely crucial to analyzing this case to remain mindful of the fact that Mr. Felkner was offered the opportunity to avail himself of an extension of the time within which he must have completed his degree requirements, but he opted not to comply with the quite minimal prerequisites that he had to meet before the extension would become operative.

Accordingly, it is abundantly clear to me that, as a matter of law, Mr. Felkner was not engaging in protected speech (Count One); did not suffer an adverse retaliation for said speech (Count Two); was not compelled to speak (Count Three); and did not have unconstitutional conditions imposed on him as a requirement for receiving his master's degree (Count Four). Therefore, in my opinion, summary judgment in defendants' favor was appropriate as to all of the first four counts.

"[I]ndependence of thought and frankness of expression occupy a high place on our scale of values, or ought to, but so too do discipline, courtesy, and respect for authority. Judgments on

how best to balance such values may well vary from school to school." *Poling*, 872 F.2d at 762. The courts have no place passing judgment on such academic decisions. It is my very definite view that plaintiff's complaints about the slings and arrows that he purports to have encountered while pursuing a graduate degree at RIC have no place in our courts.

With sincere respect for the earnestly held and well-articulated views of the majority, I find it regrettable that this litigation will now continue in the trial court—albeit in a substantially reduced form. It seems to me that that trial will be what the Supreme Court of Iowa once metaphorically described as "a play which is not worth the candle." *Van Gorder v. Sherman*, 46 N.W. 1087, 1088 (Iowa 1890). In my view, "[i]t is time for this litigation to end." *Arena v. City of Providence*, 919 A.2d 379, 396 (R.I. 2007); *see also Northern Trust Co. v. Zoning Board of Review of Westerly*, 899 A.2d 517, 520 (R.I. 2006) (mem.); *Gunn v. Union Railroad Co.*, 27 R.I. 320, 337, 62 A. 118, 125 (1905).

For the reasons set forth herein, I must record my respectful but especially vigorous dissent to the portions of the majority's opinion which reverse the hearing justice's grant of summary judgment in favor of the defendants.


**Justice Indeglia, concurring in part and dissenting in part.** I wholeheartedly concur with most of the majority's well-written opinion, including most of its holding with respect to Felkner's due process claims. However, I must respectfully dissent with regard to its due process analysis in two respects, which I believe may have affected Felkner's right to a "meaningful appeal."

**Due Process**

In the college setting, the amount of process that is due to a student depends upon the circumstances surrounding the hearing. *Hennessy v. City of Melrose*, 194 F.3d 237, 250 (1st Cir. 1999). The United States Court of Appeals for the First Circuit has stated that "[a] hearing—or the offer of one—usually is necessary when a school takes serious *disciplinary* action against a student. By contrast, academic sanctions customarily are left to academic channels and do not require a hearing as a matter of constitutional right." *Id.* (emphasis in original) (citation omitted). Additionally, that court similarly stated, in an earlier case, that "the procedures due to a student include[] notice, an explanation of the case against the student, and 'an opportunity to present his [or her] side of the story.'" *Gorman v. University of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988) (quoting *Goss v. Lopez,* 419 U.S. 565, 581 (1975)). Here, the ASC's hearing on plaintiff's failing grade would clearly be considered academic because it concerned Felkner's scholastic performance and, so, little process was constitutionally required in those proceedings. On the other hand, in the second hearing, because Felkner faced a possible expulsion from RIC's MSW program for allegedly and deceptively recording his teachers and fellow pupils—a penalty born from an issue with his professional ethics—more process was required from the ASC in the disciplinary hearing, despite the ASC's contention that this hearing was also academic.

However, no one has contended—and neither do I—that the ASC failed to give plaintiff a hearing in either case. Instead, I take issue with the alleged deprivation of certain procedures *within* those hearings. The United States Supreme Court, in *Goss*, noted that more substantial disciplinary proceedings that subject a student to greater sanctions than short suspensions may require more formal hearing procedures. *See Goss*, 419 U.S. at 584. The *Goss* Court noted that, in more serious cases, the school "may * * * summon the accuser, permit cross-examination, and

allow the student to present his own witnesses. In more difficult cases, [the disciplinarian] may permit counsel." *Id.*

In *Gorman*, the First Circuit held that a student's due process rights were not violated in disciplinary proceedings where the school did not permit him to have an attorney present, cross-examine witnesses, or record the hearings. *Gorman*, 837 F.2d at 15-16. Determining the specific procedures to which the student was entitled, the court balanced the student's right to his or her education with the school's needs to conserve limited resources in adjudicating such disciplinary matters. *Id.* at 14-15. The court found that the hearings were recorded through a written account by a university representative, which "clearly constituted a sufficient record of the proceedings." *Id.* at 16. Furthermore, relying on caselaw from other circuits, the court held that counsel was not constitutionally required at disciplinary proceedings, so long as the student was not facing any criminal charges. *Id.* Additionally, the court acknowledged that a student has no right to cross-examination in school disciplinary proceedings. *Id.*

While Felkner faced potential dismissal for his alleged deceptive recording of classes, he did not face any criminal charges in conjunction with the matter. He received notice of the complaints against him and he was afforded hearings, followed by an appeal. At the hearing, Felkner was not permitted to use an attorney, nor was he allowed to cross-examine defendants. However, I agree with the majority that none of these deprivations indicate that his due process rights were violated. *See Gorman*, 837 F.2d at 16. Where I differ from the majority is that I believe Felkner has created a genuine issue of material fact in his due process claim with respect to an alleged lack of: (1) a record of the disciplinary proceedings; and (2) written findings of fact from the ASC.

- 53 -

In her decision granting summary judgment in favor of defendants with respect to Felkner's due process claim, the motion justice did not address the issue of whether the ASC should have created a record of the disciplinary hearing, nor did she address the adequacy of any written decision. Instead, the motion justice focused solely on the issue of Felkner's inability to cross-examine the witnesses against him.

On Felkner's right to effectuate a meaningful appeal, the majority states that, "[w]hile a record of an academic disciplinary proceeding is desirable and may be required by individual educational institutions as part of the process provided * * * Felkner has not demonstrated any disputed, material facts to resolve regarding whether the process here was constitutionally insufficient." I respectfully disagree with this conclusion.

## A

### Record of the Proceedings

My first concern here is the fact that the ASC did not keep a record of the proceedings. Although due process does not require that a student be allowed to record a disciplinary hearing, the First Circuit has noted that "several courts have required some form of record." *Gorman*, 837 F.2d at 15. Alternatively, the Sixth Circuit has stated that "[w]hile due process may not impose upon the university the requirement to produce a record in all cases, fundamental fairness counsels that if the university will not provide some sort of record, it ought to permit the accused to record the proceedings if desired." *Flaim v. Medical College of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) (citing *Gorman*, 837 F.2d at 15-16). Ironically, the very basis for the disciplinary hearing, of which there is allegedly no record, was Felkner's recording of his professors and fellow students.

- 54 -

In *Gorman*, the First Circuit determined that due process did not require the school to allow the plaintiff to record the hearing because the school had internal policies for keeping records of disciplinary proceedings and did, in fact, keep a record of the plaintiff's hearing in that case. *Gorman*, 837 F.2d at 15-16. Here, unlike the school in *Gorman*, Felkner alleges that the ASC did not provide any kind of record for the disciplinary proceedings. *See id.* As this Court has recognized, it is unlikely that there can be a meaningful review of, or appeals from, any determination by an administrative body without *some* form of record. *Cf. Champlin's Realty Associates v. Tikoian*, 989 A.2d 427, 448 (R.I. 2010) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Therefore, without a record of the ASC hearing, I believe there exists a genuine issue of material fact, making summary judgment inappropriate.[1]

**B**

**Written Findings**

My second concern is that the ASC did not adequately describe the basis for its decision in the letter that it sent to Felkner.[2] The Sixth Circuit has held that "[a]n accused individual is

---

[1] Although Felkner later agreed that he would not tape any more conversations, this was only in response to the ultimatum set forth in the decision letter from the ASC.

[2] The letter states, in pertinent part:

> "Pursuant to the academic policies of the School of Social Work, the Academic Standing Committee conducted a hearing, April 27, on the allegations of Dr. Pearlmutter that you failed to adhere to the academic standards of the School by engaging in behavior that

generally not entitled to a statement of reasons for a decision against them, *at least where the reasons for the decision are obvious*." *Flaim*, 418 F.3d at 636 (emphasis added). However, that court also stated that it "recognize[d] there may be some proceedings where written findings of fact would be required[,]" because the cost to a school to issue such findings is minimal. *See id.* at 642.

In *Flaim*, the court held that, under the circumstances presented in that case, due process did not require the disciplinary committee to issue written findings of fact in light of the fact that the board expelled the plaintiff for a felony drug conviction, an obvious violation of the school's "zero-tolerance policy" regarding drugs. *Flaim*, 418 F.3d at 633, 642. Here, I believe that there is at least an issue of material fact as to whether the ASC's written decision was adequate in light of the fact that one member of the committee doubted whether there was any ethical basis to

violated the National Association of Social Workers (NASW) Code of Ethics.

"After consideration of all of the evidence, including your testimony, the Committee determined that you failed to adhere to academic standards of the School when you deceptively audio-taped a conversation with Dr. Pearlmutter in violation of Section 4.04 of the NASW Code of Ethics. The Committee was not convinced that you violated Sections 2.01 or 2.02 of the Code.

"An important academic requirement of the School of Social Work (noted in the School's Academic and Field Manual) is that all matriculated students 'act in accord' (p. 34) with the NASW Code of Ethics 'throughout their period of matriculation * * *' (p. 34). The Committee is concerned that your testimony reveals an unwillingness or inability to understand the academic necessity to comply with the School's standards. Accordingly, the Committee recommends to the Chair of the MSW department, Dr. Lenore Olsen, that you be requested to declare immediately, in writing, that you will henceforth refrain from any deceptive audio or video copying of conversations with social work colleagues and refrain from any audio or video copying without express permission from them. If you are unwilling to do so, the Committee recommends that you be dismissed from the School of Social Work."

discipline Felkner.[3]  Moreover, in its decision letter to Felkner, the committee merely cited to Section 4.04 of the NASW Rules of Ethics—which does not specifically prohibit recording of classroom discussions—without any further explanation or findings of fact as to how the recording of conversations violated that provision.  Thus, there is some question as to whether the basis of the ASC's decision was obvious. *See id.* at 636.

Furthermore, the lack of written findings may well have affected the meaningfulness of any appeal and, thus, Felkner's due process rights, stymying him from presenting cogent reasons for appeal, because Felkner might not have been able to prepare a proper response; nor would those responsible for hearing such appeal be able to conduct a proper review of his case without such findings.  In the administrative setting, this Court generally requires "an ample decisional demonstration of the grounds upon which an ultimate conclusion is predicated[,]" to "facilitat[e] judicial review, avoid[] judicial usurpation of administrative functions, assur[e] more careful administrative consideration, help[] parties plan their cases for rehearings and judicial review, and keep[] agencies within their jurisdiction." *Hooper v. Goldstein*, 104 R.I. 32, 44, 241 A.2d 809, 815 (1968).

In conclusion, the motion justice did not address either of these contentions in her decision, and the majority's short, one-paragraph analysis is insufficient to conclude that there

---

[3]  In an email to the chair of the ASC, Professor Mueller, another member of the ASC, commented:

> "[W]here in the code of ethics are we saying that this reporting process is addressed. This is not a violation anchored in professional helping relationships because I do not believe that the Code is prescriptive about confidentiality with colleagues where client information is not involved. Did you get any further sense from either Rick [Reamer] or Lenore [Olsen] about the linkage to the Code?"

was no genuine issue of material fact that a record was not required in this case. Although the defendants may still ultimately prevail on this issue, I believe that Felkner at least presented a genuine issue of material fact with regard to whether the ASC was required to create some form of record in the disciplinary proceedings. Additionally, I would hold that there was a material dispute as to the sufficiency of the written decision. The cost of both of these procedures was slight when compared to the danger of an erroneous deprivation of Felkner's right to receive an education. *See Gorman*, 837 F.2d at 14.

While I concur in most of the majority opinion, for the above-stated reasons, I must respectfully dissent.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | William Felkner v. Rhode Island College et al. |
| **Case Number** | No. 2016-17-Appeal.<br>(PC 07-6702) |
| **Date Opinion Filed** | March 18, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Thomas W. Lyons III, Esq.<br>Rhiannon S. Huffman, Esq. |
| | For Defendants:<br><br>Jeffrey S. Michaelson, Esq.<br>Timothy J. Dodd, Esq. |